# BUTTZ *v.* NORTHERN PACIFIC RAILROAD.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF
DAKOTA.

Argued October 26, 27, 1886. — Decided November 15, 1886.

The grant by the act of Congress of July 2, 1864, to the Northern Pacific Railroad Company, of lands to which the Indian title had not been extinguished, operated to convey the fee to the company, subject to the right of occupancy by the Indians.

The manner, time, and conditions of extinguishing such right of occupancy were exclusively matters for the consideration of the government, and could not be interfered with nor put in contest by private parties.

The agreement of the Sisseton and Wahpeton bands of Dakota or Sioux Indians for the relinquishment of their title was accepted on the part of the United States when it was approved by the Secretary of the Interior, on the 19th of June, 1873. That agreement stipulating to be binding from its date, May 19, 1873, and the Indians having retired from the lands to their reservations, the relinquishment of their title, so far as the United States are concerned, held to have then taken place.

Upon the definite location of the line of the railroad, on the 26th of May, 1873, the right of the company, freed from any incumbrance of the Indian title, immediately attached to the alternate sections; and no preemptive right could be initiated to the land, so long as the Indian title was unextinguished.

When the general route of the road provided for in section six of the Act of July 2, 1864, was fixed, and information thereof was given to the Land Department by the filing of a map thereof with the Secretary of the Interior, the statute withdrew from sale or preëmption the odd sections to the extent of forty miles on each side thereof; and, by way of precautionary notice to the public, an Executive withdrawal was a wise exercise of authority.

The general route may be considered as fixed, when its general course and direction are determined, after an actual examination of the country or from a knowledge of it, and it is designated by a line on a map, showing

the general features of the adjacent country and the places through or · by which it will pass.

That part of section three of said act, which excepts from the grant lands reserved, sold, granted, or otherwise appropriated, and to which a preemption and other rights and claims have not attached, when a map of definite location has been filed, does not include the Indian right of occupancy within such " other rights and claims; " nor does it include preëmptions where the sixth section declares that the land shall not be subject to preëmption.

The following is the case as stated by the court :

This was an action for the possession of a tract of land in the Territory of Dakota. The plaintiff below, the Northern Pacific Railroad Company, asserted title to the premises under a grant made by the act of Congress of July 2, 1864. The defendant, Peronto, asserted a right to preëmpt the premises by virtue of his settlement upon them under the preëmption law of September 4th, 1841, and that his right thereto was superior to that of the railroad company.

The action was brought into the District Court of the Territory. The complaint was in the usual form in such cases, alleging the incorporation of the plaintiff, its ownership in fee of the premises, (which are described,) and its right to their immediate possession, and that they are withheld by the defendant, with a prayer for judgment for their possession, and damages for the withholding.

The answer of the defendant admits the incorporation of the plaintiff, and that he is in possession of the premises, but denies the other allegations of the complaint. It then sets up as a further defence that he settled upon the premises on October 5th, 1871, and resided thereon, and the several steps taken by him to perfect a right of preëmption to them, and that he possessed the qualifications of a preëmptor under the laws of the United States. It concludes with a prayer that the title of the plaintiff be declared void, and that the plaintiff be enjoined from enforcing or attempting to enforce it ; that the title be declared to be in the defendant ; and that such other and further relief be granted as may be necessary to protect and preserve his rights.

The plaintiff replied, traversing the allegations of the answer; and the issues, by consent of the parties, were tried by the court, without a jury. The court found for the plaintiff, and gave judgment in its favor for the possession of the premises, with costs. On appeal to the Supreme Court of the Territory, the judgment was affirmed, and, by appeal from the latter judgment, the case was brought to this court. Since it was docketed here, the defendant, who was the appellant, died, and, by leave of the court, his executor, the devisee of his estate, has been substituted as appellant in his place.

The act of Congress of July 2d, 1864, is entitled "An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget Sound, on the Pacific Coast, by the northern route." 13 Stat. 365.

By the first section, the Northern Pacific Railroad Company was incorporated and authorized to equip and maintain the railroad and telegraph line mentioned, and was vested with all the powers and privileges necessary to carry into effect the purposes of the act.

By the third section, a grant of land was made to the company. Its language is: "That there be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preëmption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office."

By the sixth section, it was enacted "that the President of

the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby, granted shall not be liable to sale or entry or preëmption before or after they are surveyed, except by said company, as provided in this act; but the provisions of the act of September, eighteen hundred and forty-one, granting preëmption rights, and the acts amendatory thereof, and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May twenty, eighteen hundred and sixty-two, shall be, and the same are hereby, extended to all other lands on the line of said road when surveyed, excepting those hereby granted to said company. And the reserved alternate sections shall not be sold by the government at a price less than two dollars and fifty cents per acre when offered for sale."

At the time this act was passed, the land in controversy, and other lands covered by the grant, were in the occupation of the Sisseton and Wahpeton Bands of Dakota or Sioux Indians; and the second section provided that the United States should extinguish, as rapidly as might be consistent with public policy and the welfare of the Indians, their title to all lands "falling under the operation of this act and acquired in the donation to the road."

On the 19th of February, 1867, a treaty was concluded between the United States and these Bands, which was ratified on the 15th of April and proclaimed on the 2d of May of that year, 15 Stat. 505, in the second article of which the Bands ceded "to the United States the right to construct wagon roads, railroads, mail stations, telegraph lines, and such other public improvements as the interest of the government may require, over and across the lands claimed by said bands, (including their reservation as hereinafter designated,) over any route or routes that may be selected by authority of the government, said lands so claimed being bounded on the south and east by the treaty line of 1851 and the Red river of the North to the mouth of Goose river, on the north by the Goose

river and a line·running from the source thereof by the most westerly point of Devil's lake to the Chief's Bluff at the head, of James river, and on the west by the James river to the mouth of, Mocasin river, and thence to Kampeska lake." By articles III and IV certain lands were set apart as permanent reservations for the Indians — one of which was known as Lake Travers reservation, and the other as Devil's lake reservation — so called because their boundary lines commenced respectively at those lakes.

On the 7th of June, 1872, Congress passed an act "to quiet the title to certain lands in Dakota Territory," which provided that it should be the duty of the Secretary of the Interior to examine and report to Congress what title or interest the Sisseton and Wahpeton Bands of Sioux Indians had to any portion of the land mentioned and described in the second article of that treaty, except the reservations named; and whether any, and if any, what, compensation ought, in justice and equity, to be made to said bands for the extinguishment of whatever title they might have to said lands. 17 Stat. 281.

Under this act, the Secretary of the Interior appointed three persons as commissioners to treat with the Indians for the relinquishment of their title to the land. On the 20th of September, 1872, they made an agreement or treaty with the Bands for such relinquishment. This agreement recited the conclusion of the treaty of 1867, and the cession by it to the United States of certain privileges and rights supposed to belong to said Bands in the territory described in the second, article of the treaty; and that it was desirable that all the territory, except that portion comprised in certain reservations described in articles III and IV of the treaty, should be ceded absolutely to the United States, upon such considerations as in justice and equity should be paid therefor; and that the lands were no longer available to the Indians for the purposes of the chase, and their value or consideration was essentially necessary to enable them to cultivate portions of the permanent reservations, and become self-supporting by the cultivation of the soil and other pursuits of husbandry. "Therefore," the agreement continues, "the said Bands represented in said

treaty, and parties thereto, by their chiefs and headmen, now assembled in council, do propose to M. N. Adams, William H. Forbes, and James Smith, Jr., commissioners on behalf of the United States, as follows:

"First. To sell, cede, and relinquish to the United States all their right, title, and interest in and to all lands and terri-tory. particularly described in article II of said treaty, as well as all lands in the Territory of Dakota to which they have title or interest, excepting the said tracts particularly described and bounded in articles III and IV of said treaty, which last-named tracts and territory are expressly reserved as perma-nent reservation for occupancy and cultivation, as contemplated by articles VIII, IX, and X of said treaty."

"Second. That, in consideration of said cession and relin-quishment, the United States should advance and pay annu-ally, for the term of ten years from and after the acceptance by the United States of the propositions herein submitted, eighty thousand ($80,000) dollars, to be expended, under the direction of the President of the United States, on the plan and in accordance with the provisions of the treaty aforesaid, dated February 19, 1867, for goods and provisions, for the erection of manual labor and public schools, and to the erection of mills, blacksmith shops, and other work shops, and to aid in opening farms, breaking land, and fencing the same, and in furnishing agricultural implements, oxen, and milk cows, and such other beneficial objects as may be deemed most con-ducive to the prosperity and happiness of the Sisseton and Wahpeton Bands of Dakota or Sioux Indians, entitled thereto, according to the said treaty of February 19, 1867."

This agreement contained seven other articles, some of which had provisions of great value to the Indians. It does not appear that it was ever presented to the Senate of the United States for ratification, but it was communicated to Congress by the Secretary of the Interior; and in the Indian appropriation act of February 14th, 1873, an amount was con-ditionally appropriated to meet the first instalment of the sum provided by the second article — eighty thousand dollars. The condition was that the amount should not be expended

until that agreement, amended by the exclusion of all the articles except the first two, should be ratified by the Indians. The agreement, exclusive of those articles, was confirmed by Congress.    17 Stat. 456.

The ratification of the agreement, as amended, was obtained from the Indians at the two reservations; from those on one reservation, on May 2, 1873, and from those on the other reservation on the 19th of the same month.    This ratification was accepted and approved by the Secretary of the Interior on the 19th of June, 1873, and the expenditure of the appropriation made was authorized.    No approval of the agreement was had by Congress until the passage of the Indian appropriation act of June 22d, 1874, by which it was confirmed and an appropriation made to meet the second instalment of the consideration stipulated.

It appears by the findings of the court, that some time in the fall of 1871, under the act of Congress mentioned, and other acts and resolutions relating to the same subject, the Railroad Company commenced work on that part of its line of road beginning on the westerly bank of the Red River of the North (which was the eastern boundary of Dakota), and extending westerly through and across what was afterwards shown by the public surveys to be the section of land of which the premises in controversy form a part, namely, section 7 in township 139 and range 48.    It also caused all that part of its line of road thus located to be graded and prepared for its superstructure; and in June following the superstructure and the iron rails were laid, and that part of the road was completed which crossed the section named, and ever since the road has been maintained and operated.

. On the 21st of February, 1872, the company filed in the office of the Secretary of the Interior a map showing that part of the general route of the road beginning at the westerly bank of the Red River of the North, and extending westerly to James River, in Dakota Territory.    On the 30th of March following, the acting Commissioner of the General Land Office forwarded to the register and receiver of the Pembina land office, within the limits of which the tract of land in contro-

versy was situated, a description of the designated route, and, by order of the Secretary of the Interior, directed them to withhold from sale or location, preëmption, or homestead entry, all the surveyed and unsurveyed odd numbered sections of public lands falling within the limits of forty miles, as designated on the map, and stated that this order would take effect from the date of its receipt by them.

The order, with the diagram, was received by them April 20th, 1872. The diagram represented the route of the road as passing over and across the section of land in question. The order of withdrawal thus given was never afterwards revoked.

On May 26th, 1873, the company filed in the office of the Commissioner of the General Land Office a map, showing the definite location of that part of its line of road extending from the Red River of the North to the Missouri River in Dakota Territory. All that portion of this definite location, from the Red River to the west line of the section named, was the same as that made in 1871. On the 11th of June, 1873, the acting Commissioner of the General Land Office addressed a letter to the local register and receiver, informing them of the filing of this map of definite location, and transmitted to them a diagram showing the limits of the land grant along said line, and also the limits of the withdrawal ordered on March 30th, 1872, upon a designated line; and directed them to withhold from sale or entry all the odd numbered sections, both surveyed and unsurveyed, falling within those limits. This letter, with the diagram referred to, was received at the Pembina land office on June 24th, 1873.

Soon after the execution of the amended agreement with the Indians, mentioned above, which was approved by the Secretary of the Interior on the 19th of June, 1873, the government land surveys of the region embraced in it were completed, and plats thereof were filed in the local land office. Those surveys show that the premises in controversy constitute a portion of the odd section number seven, which was granted to the railway company.

The defendant, Peronto, settled, as already stated, upon

that section on October 5th, 1871. It is found by the court that he had all the qualifications of a preëmptor, and entered upon the land with the intention of securing a preëmption right to it under the laws of the United States, and built a house upon it, in which he resided. On the 11th of August, 1873, he presented his declaratory statement to the register and receiver of the local land office, stating his intention to claim a preëmption right to a portion of the section (describing it) and his settlement thereon in October, 1871. This declaratory statement was presented within three months, after the township plats, showing the government surveys, had been filed in the local land office. The register and receiver refused to file it, for the alleged reason that the land therein described was the land of the Railroad Company, as shown by its diagram filed in the Department of the Interior, February 21, 1872, and that his alleged prior settlement was illegal, the lands not being subject to preëmption settlement by reason of the Indian treaty. The defendant thereupon appealed from this ruling to the Commissioner of the General Land Office, by whom, on the 14th of February, 1874, it was approved and confirmed. The defendant then appealed to the Secretary of the Interior, and he approved the decision of the Commissioner.

Mr. *Albert G. Riddle* and Mr. *Henry E. Davis* for appellant. Mr. *James E. Padgett* was with them on their brief.

I. At the date of the passage of the act of July 2, 1864, the lands in controversy were Indian lands. Act of June 30, 1834, 4 Stat. 729. They were not " public lands," nor subjected to the operation of acts dealing with " public lands," but remained " Indian lands." *Leavenworth, Lawrence & Galveston Railroad* v. *United States,* 92 U. S. 733, 742; *United States* v. *Forty-Three Gallons Whiskey,* 93 U. S. 188; *Bates* v. *Clark,* 95 U. S. 204. The right of Indians to the lands they occupy is unquestioned until the title is extinguished by voluntary cession. *Cherokee Nation* v. *Georgia,* 5 Pet. 1 : and under the act of 1834 is as sacred as the title

of the United States to the. fee. *United States* v. *Cook*, 19 Wall. 591. Whenever a tract of public land is legally appropriated to any purpose, it is thereby severed from the mass of public lands, so that no subsequent law or proclamation or sale will be construed to embrace it. *Wilcox* v. *Jackson*, 13 Pet. 498, 513; *Polk* v. *Wendall*, 9 Cranch, 87.; *Vincennes University* v. *Indiana*, 14 How. 268. This principle applies with especial force to Indian reservations. For all practical purposes Indians own their lands. *United States* v. *Payne*, 2 McCrary, 289; *Dubuque & Sioux City Railroad* v. *Des Moines Valley Railroad*, 109 U. S. 329, 334. Lands forming part of an Indian grant at its date are excepted from its operation. *Leavenworth, Lawrence & Galveston Railroad* v. *United States*, above cited; *Clark* v. *Smith*, 13 Pet. 195; *Kansas Pacific Railroad* v. *Atchison &c. Railroad*, 112 U. S. 414, 422. Unless, therefore, the act making the grant to the Northern Pacific Company contains "specific language, leaving no room for doubt as to the legislative will," the lands in controversy, being Indian lands at the date of the grant, were excluded from the operation thereof.

II. That act contained no such provision. It did contain a provision that the United States should extinguish, as rapidly as may be consistent with public policy and the welfare of the Indians, the Indian titles to all lands falling under the operation of the act and acquired in the donation named therein. It was evident that the route indicated in the act must, of necessity, pass through much of the wild Indian lands of the northwest : and, as the construction of the road would make it expedient to open up that territory, it was but just that the company itself should, as far as possible and proper, be put in the same position as other companies receiving grants of lands, that is to say : to be given as much of its grant as possible adjacent to its road. From such considerations Congress thought that the usual complete exclusion of Indian lands would operate harshly ; wherefore the provision in question was inserted in the act : with the purpose of enabling the company's grant to attach to what at the date of the act were Indian lands, if in proper condition to pass at the date of

definite location, as prescribed by the act; or, if not in con-dition so to pass, to furnish the measure of indemnity in other lands for the lands so, as it were, lost. As was said in the *Leavenworth, Lawrence & Galveston Railroad* v. *United States,* in order to neg..tive the idea of exclusion, "this was necessary, although the road ran through territory occupied by wild tribes." 92 U. S. 744. But further than this the provision was not intended to go, and does not go, except that it also holds out a promise on the part of the government to do what might be deemed expedient to put the Indian lands, at the time of the definite location, in the condition requisite to pass under the grant, viz., in such condition that the United States should have "full title" thereto, as defined in the act. *Newhall* v. *Sanger,* 92 U. S. 761; *Wolcott* v. *Des Moines Co.* 5 Wall. 681. These views are greatly strengthened by the dealings of the United States with the Sisseton and Wahpeton Indians. See 15 Stat. 506; 16 Stat. 378; and 17 Stat. 281.

III. Assuming it to be established that the act of 1864 did not grant to the company any Indian lands to which the Indian title should not have been extinguished at the time the line of the road might be definitely fixed; and that the under-taking to extinguish the Indian title was intended only to put as much of the Indian lands as the United States should think proper in condition to pass under the grant, it is next con-tended that, at the time the line of the road was definitely fixed, the lands in controversy had not been put into condi-tion so to pass. *Van Wyck* v. *Knevals,* 106 U. S. 360, 366–8; *Kansas Pacific Railway* v. *Dunmeyer,* 113 U. S. 629, 634; *Walden* v. *Knevals,* 114 U. S. 373, 374–6; *Northern Pacific Railroad* v. *Traill County,* 115 U. S. 600; *Stark* v. *Starrs,* 6 Wall. 402, 418; *Railroad Co.* v. *Baldwin,* 103 U. S. 426; *Winona & St. Peter Railroad* v. *Barney,* 113 U. S. 618.

IV. If the lands were subject to preëmption, the record leaves no doubt of Peronto's right to enter; and this right to the lands could not be prejudiced by the refusal of the local officers to receive his declaratory statement duly presented. *Frisbie* v. *Whitney,* 9 Wall. 187. *Shepley* v. *Cowan,* 91 U. S. 330. And if the action of the land officers, by erroneously

construing the law, thus deprived him of a substantial right, his title to remedy in equity is undoubted. *Minnesota* v. *Batchelder*, 1 Wall. 109; *Samson* v. *Smiley*, 13 Wall. 91; *Ferguson* v. *McLaughlin*, 96 U. S. 174; *Moore* v. *Robbins*, 96 U. S. 530; and all doubts are to be resolved against the company. *Rice* v. *Railroad Co.*, 1 Black, 358, 380; *Leavenworth, Lawrence & Galveston Railroad* v. *United States, supra.*

*Mr. W. P. Clough* for appellee.

MR. JUSTICE FIELD, after stating the case, delivered the opinion of the court, as follows:

The land in controversy and other lands in Dakota, through which the Northern Pacific Railroad was to be constructed, was within what is known as Indian country. At the time the act of July 2d, 1864, was passed, the title of the Indian tribes was not extinguished. But that fact did not prevent the grant of Congress from operating to pass the fee of the land to the company. The fee was in the United States. The Indians had merely a right of occupancy, a right to use the land subject to the dominion and control of the government. The grant conveyed the fee subject to this right of occupancy. The Railroad Company took the property with this incumbrance. The right of the Indians, it is true, could not be interfered with or determined except by the United States. No private individual could invade it, and the manner, time, and conditions of its extinguishment were matters solely for the consideration of the government, and are not open to contestation in the judicial tribunals. As we said in *Beecher* v. *Wetherby*, 95 U. S. 517, 525: "It is to be presumed that in this matter the United States would be governed by such considerations of justice as would control a Christian people in their treatment of an ignorant and dependent race. Be that as it may, the propriety or justice of their action towards the Indians with respect to their lands is a question of governmental policy, and is not a matter open to discussion in a controversy between third parties, neither of whom de-

rives title from the Indians. The right of the United States to dispose of the fee of lands occupied by them has always been recognized by this court from the foundation of the government." In support of this doctrine several authorities were cited in that case.

In *Johnson* v. *McIntosh*, 8 Wheat. 543, 575, which was here in 1823, the court, speaking by Chief Justice Marshall, stated the origin of this doctrine of the ultimate title and dominion in the United States. It was this: that, upon the discovery of America, the nations of Europe were anxious to appropriate as much of the country as possible, and, to avoid contests and conflicting settlements among themselves, they established the principle that discovery gave title to the government by whose subjects or by whose authority it was made, against all other governments. This exclusion of other governments necessarily gave to the discovering nation the sole right of acquiring the soil from the natives, and of establishing settlements upon it. It followed that the relations which should exist between the discoverer and the natives were to be regulated only by themselves. No other nation could interfere between them. The Chief Justice remarked that " the potentates of the old world found no difficulty in convincing themselves that they made ample compensation to the inhabitants of the new, by bestowing on them civilization and Christianity in exchange for unlimited independence." Whilst thus claiming a right to acquire and dispose of the soil, the discoverers recognized a right of occupancy or a usufructuary right in the natives. They accordingly made grants of lands occupied by the Indians, and these grants were held to convey a title to the grantees, subject only to the Indian right of occupancy. The Chief Justice adds, that the history of America, from its discovery to the present day, proves the universal recognition of this principle.

In *Clark* v. *Smith*, 13 Pet. 195, 201, which was here in 1839, the patent under which the complainant became the owner in fee of certain lands was issued by the Commonwealth of Kentucky in 1795, when the lands were in possession of the Chickasaw Indians, whose title was not extinguished until 1819. It

was objected that the patent was void because it was issued for lands within a country claimed by Indians, but the court replied, "That the colonial charters, a great portion of the individual grants by the proprietary and royal governments, and a still greater portion by the States of this Union after the revolution, were made for lands within the Indian hunting-grounds. North Carolina and Virginia, to a great extent, paid their officers and soldiers of the revolutionary war by such grants; and extinguished the arrears due the army by similar means. It was one of the great resources that sustained the war, not only by these States but by others. The ultimate fee (encumbered with the Indian right of occupancy) was in the crown previous to the revolution, and in the States of the Union afterwards, and subject to grant. This right of occupancy was protected by the political power and respected by the courts until extinguished; when the patentee took the unencumbered fee. So this court, and the State courts, have uniformly and often holden."

In the grant to the Railroad Company now before us, Congress was not unmindful of the title of the Indians to the lands granted, and it stipulated for its extinguishment by the United States as rapidly as might be consistent with public policy and the welfare of the Indians.

In compliance with the pledge thus given, the United States took steps, first, to obtain from the Indians the right to construct railroads, wagon roads, and telegraph lines across their lands, and to make such other improvements upon them as the interests of the government might require, and afterwards to obtain a cession of their entire title.

The right to construct railroads and telegraph lines across their lands was secured by the treaty concluded on the 19th of February, 1867, ratified on the 15th of April, and proclaimed on the 2d of May of that year. The right was in terms ceded to the United States, but the cession must be construed to authorize any one deriving title from the United States to exercise the same right. 15 Stat. 505.

For the relinquishment of the entire title of the Indians to the lands, an agreement was made by commissioners appointed

by the Secretary of the Interior, under the act of Congress of June 7, 1872. That agreement in form was merely a proposition by the Indians to cede their title, upon certain money considerations to be paid, and certain acts to be performed by the United States. Congress declined to approve of it in its entirety, but expressed an approval of it so far as it related to the cession of the title of the Indians upon the money considerations named. It refused, however, to allow an appropriation made to meet the first instalment of the money consideration to be expended, except upon the condition that the Indians should abandon the other provisions and ratify the agreement thus modified. The Indians on the different reservations accepted the condition and ratified the agreement as modified — those on one reservation on May 2, 1873, and those on the other on the 19th of the same month.

The agreement, thus ratified, was forwarded to the Secretary of the Interior, and was approved by him on the 19th of June following; and on June 22, 1874, Congress approved it in the Indian appropriation act of that year, when it also provided for the payment of the second instalment of the money consideration.

This modified agreement must be considered as accepted, on the part of the United States, when it was approved by the Secretary of the Interior. Some official recognition was necessary to satisfy those who might be interested as to the good faith of the alleged consent of the Indians; whether the parties acting nominally in their behalf really represented them, and whether their assent was freely given after full knowledge of the import of the legislation of Congress. Proof of these facts was not to rest in the recollection of witnesses, but in the official action of the officers of the government, or in the legislation of Congress. The agreement, however, on the part of the Indians was only to cede their title; it was not a cession in terms by them. The officers of the Land Department, however, treated it as an actual cession of title from its date. The Indians had then retired to the reservations set apart for them by the treaty of 1867, thus giving up the occupancy of the other lands. The relinquishment thus made was

as effectual as a formal act of cession. Their right of occupancy was, in effect, abandoned, and full consideration for it being afterwards paid, it could not be resumed. The agreement in terms provided that it should be binding from its ratification. So, therefore, considered in connection with the actual retirement of the Indians from the land, it may properly be treated as establishing the extinguishment of their title from its date, so far as the United States are concerned. The definite location of the line of railroad was subsequently made by the company, and a map of it filed with the Secretary of the Interior. The right of the company, freed from any incumbrance of the Indian title, immediately attached to the alternate sections, a portion of one of which constitutes the premises in controversy. The defendant could not initiate any preëmptive right to the land so long as the Indian title remained unextinguished. The act of Congress excludes lands in that condition from preëmption. Rev. Stat. § 2257.

If we are mistaken in this view, and the relinquishment of the right of occupancy by the Indians is not to be deemed effected until the agreement was ratified by Congress in June, 1874, notwithstanding their actual retirement from the lands, the result would not be changed. The right of the company to the odd sections within the limits of its grant, covered by the Indian claim, did not depend upon the extinguishment of that claim before the definite location of the line of the road was made, and a map thereof filed with the Commissioner of the General Land Office. The provisions of the third section, limiting the grant to lands to which the United States had then full title, they not having been reserved, sold, granted, or otherwise appropriated, and being free from preëmption or other claims or rights, did not exclude from the grant Indian lands, not thus reserved, sold, or appropriated, which were subject simply to their right of occupancy. Nearly all the lands in the Territory of Dakota, and, indeed, a large, if not the greater, portion of the lands along the entire route to Puget Sound on which the road of the company was to be constructed, was subject to this right of occupancy by the Indians. With knowledge of their title and its impediment

to the use of the lands by the company, Congress made the grant, with a stipulation to extinguish the title. It would be a strange conclusion to hold that the failure of the United States to secure the extinguishment at the time when it should first become possible to identify the tracts granted, operated to recall the pledge and to defeat the grant. It would require very clear language to justify a conclusion so repugnant to the purposes of Congress expressed in other parts of the act. The only limitation upon the action of the United States with respect to the title of the Indians was that imposed by the act of Congress, that they would extinguish the title as rapidly as might be "consistent with public policy and the welfare of said Indians." Subject only to that condition, so far as the Indian title was concerned, the grant passed the fee to the company. In our judgment, the claims and rights mentioned in the third section are such as are asserted to the lands by other parties than Indians having only a right of occupancy.

Assuming that the extinguishment of the Indian title to the lands in controversy may, so far as any claim to them against the United States is concerned, be held to have taken place at the date of the amended agreement—taking the last date, when the Indians on the second reservation ratified it—the defendant did not acquire any right of preemption, by his continued settlement afterwards. The act of Congress not only contemplates the filing by the company, in the office of the Commissioner of the General Land Office, of a map showing the definite location of the line of its road, and limits the grant to such alternate odd sections as have not, at that time, been reserved, sold, granted, or otherwise appropriated, and are free from preemption, grant, or other claims or rights; but it also contemplates a preliminary designation of the general route of the road, and the exclusion from sale, entry, or preemption of the adjoining odd sections within forty miles on each side, until the definite location is made. The third section declares that after the general route shall be fixed, the President shall cause the lands to be surveyed for forty miles in width on both sides of the entire line as fast as may be required for the construction of the road,

and that the odd sections granted shall not be liable to sale, entry, or preëmption, before or after they are surveyed, except by the company. The general route may be considered as fixed when its general course and direction are determined after an actual examination of the country or from a knowledge of it, and is designated by a line on a map showing the general features of the adjacent country and the places through or by which it will pass. The officers of the Land Department are expected to exercise supervision over the matter so as to require good faith on the part of the company in designating the general route, and not to accept an arbitrary and capricious selection of the line irrespective of the character of the country through which the road is to be constructed. When the general route of the road is thus fixed in good faith, and information thereof given to the Land Department by filing the map thereof with the Commissioner of the General Land Office, or the Secretary of the Interior, the law withdraws from sale or preëmption the odd sections to the extent of forty miles on each side. The object of the law in this particular is plain: it is to preserve the land for the company to which, in aid of the construction of the road, it is granted. Although the act does not require the officers of the Land Department to give notice to the local land officers of the withdrawal of the odd sections from sale or preëmption, it has been the practice of the Department in such cases, to formally withdraw them. It cannot be otherwise than the exercise of a wise precaution by the Department to give such information to the local land officers as may serve to guide aright those seeking settlements on the public lands; and thus prevent settlements and expenditures connected with them which would afterwards prove to be useless.

Nor is there anything inconsistent with this view of the sixth section as to the general route, in the clause in the third section making the grant operative only upon such odd sections as have not been reserved, sold, granted, or otherwise appropriated, and to which preëmption and other rights and claims have not attached, when a map of the definite location has been filed. The third section does not embrace sales and pre-

emptions in cases where the sixth section declares that the land shall not be subject to sale, or preëmption. The two sections must be so construed as to give effect to both, if that be practicable.

In the present case, the general route of the road was indicated by the map filed in the office of the Secretary of the Interior on the 21st of February, 1872. It does not appear that any objection was made to the sufficiency of the map, or to the route designated, in any particular. Accordingly, on the 30th of March, 1872, the Commissioner of the General Land Office transmitted a diagram or map, showing this route, to the officers of the local land office in Dakota, and by direction of the Secretary ordered them to withhold from sale, location, preëmption, or homestead entry all surveyed and unsurveyed odd numbered sections of public land falling within the limits of forty miles, as designated on the map.

This notification did not add to the force of the act itself, but it gave notice to all parties seeking to make a preëmption settlement that lands within certain defined limits might be appropriated for the road. At that time the lands were subject to the Indian title. The defendant could not, therefore, as already stated, have then initiated any preëmption right by his settlement; and the law cut him off from any subsequent preëmption. The withdrawal of the odd sections mentioned from sale or preëmption, by the sixth section of the act, after the general route of the road was fixed, in the manner stated, was never annulled.

It follows that the defendant could never afterwards acquire any rights against the company by his settlement.

*Judgment affirmed.*