UNITED STATES *v.* BRANDESTEIN and others.

*(District Court, N. D. California.* November 25, 1887.)

PUBLIC LANDS—UNLAWFUL INCLOSURE—RAILROAD GRANT.

Act of congress of February 25, 1885, provides that all inclosures of public lands entered by any person or corporation without claim or color of title to said lands acquired in good faith shall be unlawful. Defendant, as licensee of the Southern Pacific Railroad Company, had inclosed certain lands of the land grant of the company. The lands had, on filing of the plat of the proposed road by the company, been withdrawn from settlement by the United States, though they had not been earned yet by the company. *Held,* that such inclosure of lands did not fall within those prohibited by the act of congress.

*John T. Carey,* U. S. Atty., and *H. C. McPike,* Asst. U. S. Atty., for the United States.

*Milton Eisner,* (*J. D. Redding,* of counsel,) for defendants.

HOFFMAN, J. This action is brought under the act of February 25, 1885, entitled "An act to prevent unlawful occupancy of public lands." The first section is as follows:

"All inclosures of public lands in any state or territory of the United States heretofore or to be hereafter made, erected, or constructed by any person, party, association, or corporation, to any of which land included within the inclosure the person, party, association, or corporation making or controlling the inclosure had no claim or color of title, made or acquired in good faith, or an

asserted right thereto, by or under any claim made in good faith, with a view to entry thereof at the proper land-office, under the general laws of the United States, at the time any such inclosure was or shall be made, are hereby declared to be unlawful, and the maintenance, creation, construction, or control of any such inclosure is hereby forbidden; and the assertion of a right to the exclusive use and occupancy of any part of the public lands of the United States in any state, or in any of the territories of the United States, without claim or color of title, or asserted right, as above specified, as to inclosure, is likewise declared unlawful, and hereby prohibited."

The second section empowers the court before which the suit is brought, in case the inclosure shall be found unlawful, to make the proper order or decree for the destruction of the inclosure in a summary way, unless the inclosure shall be removed within five days after the order of the court.

The evidence in this case discloses that the defendants have erected a continuous fence on lands owned by them, or on odd-numbered sections of land within the limits of the grant to the Southern Pacific Railroad Company by the act of June 27, 1866, of which company they are licensees. This fence surrounds and incloses a large tract of land, in the center of which is an inconsiderable acreage of public land; but road-ways are provided, and the fence furnished with gates, which are kept unlocked, and which afford access to the public land within the inclosure. The evidence further shows that, on January 3, 1867, the railroad company, in compliance with the provisions of the act of 1866, filed in the office of the commissioner of the land-office a plat thereof, in which the line of the road was designated. By the sixth section of the act the odd sections of land granted by the act, after the general route of the railroad shall be fixed, are declared "not to be liable to sale, entry, or pre-emption before or after they are surveyed, except by the said company, as provided in the act." The question to be decided is whether this continuous fence, constructed as above described, has been built and maintained in violation of the act of 1885, and should be removed by order of the court.

I do not understand it to be contended on the part of the United States that the act was intended to prohibit the erection of fences upon their own lands by the owners thereof, whenever, by connecting with other fences built on public lands, they form part of a continuous line of fencing, and serve to complete an inclosure of public lands. But it is urged that the title to the reserved or odd sections upon which fences have been erected by the license or authority of the railroad company is in the United States until the railroad is constructed and accepted by the government, and that, until the lands have been earned by the railroad company, the odd sections must be regarded as public land, and their inclosure within the prohibition of the act of 1885.

The defendants, on the other hand, contend that the act of congress granting lands to aid in the construction of the railroad operated as a grant *in præsenti* of certain sections of land, to be afterwards located; that when so located, by the filing in the land-office of a map designating the route of the proposed railroad, as prescribed by law, the location became

certain, and the title of the company attached to the granted sections as of the date of the approval of the act; that the provisions of the act imposing certain conditions on the company do not affect the creation or vesting of the estate granted by the act; that they are merely conditions subsequent, which render the estate liable to be defeated for breach of such conditions, and that upon such breach congress alone has power to declare or take advantage of the forfeiture. These views are maintained in a very elaborate opinion by the supreme court of Montana in *Railroad Co.* v. *Majors*, 2 Pac. Rep. 322. There are also some general expressions in the opinion of the supreme court in *Buttz* v. *Railroad Co.*, 119 U. S. 55, 7 Sup. Ct. Rep. 100, from which the same conclusions might be drawn.

On the other hand, it has been held by DEADY, J., in two judgments marked by his accustomed vigor and clearness, that the odd-numbered sections granted by congress in aid of railroads are set apart and devoted to the construction of the roads, but that they are not granted *in præsenti* to the corporations; and that the act is, in effect, an agreement or provision that the same shall be conveyed absolutely to the corporation when, and as fast as, any 25 miles of the roads shall be completed and accepted by the United States; and that in the mean time the legal title to the unearned sections remains in the United States, who may therefore maintain legal proceedings against any one who unlawfully cuts timber upon them. *U. S.* v. *Childers*, 8 Sawy. 171, 12 Fed. Rep. 586; *U. S.* v. *Ordway*, 30 Fed. Rep. 36. I cannot add anything to the force of the arguments by which this eminent judge has maintained the conclusions he has reached. I will only remark that it would be a strange instance of improvidence or oversight on the part of congress if, when setting apart and devoting so large a portion of the public domain to aid and secure the construction of a railroad, it has conferred upon the projectors of the road the right to dispose of, incumber, or greatly impair the value of the lands, by cutting the timber, or other waste, when as yet the road only exists on paper, and when its construction has not been, and perhaps never will be, even commenced. But it is to be observed that, by the terms of the law, upon the filing of the map designating the route of the proposed railroad, the granted sections are withdrawn from settlement and occupancy under the homestead and pre-emption laws. They therefore cease to be vacant public lands of the United States, so far as that phrase imports lands open to settlement, and, whether or not the fee passes to the companies so that they can alienate, incumber, or waste them, at least an inchoate or inceptive title passes, which will ripen into a perfect title when it is earned by the construction of the road; and in the mean time the lands are held in trust for the company, by the government, which has agreed not to dispose of or appropriate them. Whether the companies may not, while the road is in process of construction, enter and build fences upon the land, was not considered or decided by Judge DEADY.

But whatever view may be taken of the nature of the railroad company's title to the granted sections before the completion and acceptance

of so much of the road as will entitle them to a patent, it is, I think, plain that the entering and construction of fences upon the land are not within the prohibition contained in the act of 1885. That act, as the debates clearly show, was intended to prevent the inclosure and appropriation of vast tracts of public land, said to be millions of acres in extent, by associations of wealthy cattle owners known as "cattle kings," without a shadow or pretense of title. These tracts were surrounded by barbed wire fences, and all persons desirous of settling upon the land under the laws of the United States were rigorously excluded, in some cases by violence or threats. Such inclosures the law was intended to prohibit, and they were required to be demolished by the decree of the court; but great care seems to have been taken to restrict the application of this unusual and summary remedy to cases of wholly unauthorized appropriations and inclosures of public lands, to which the party making the inclosure *"had no claim or color of title made or acquired in good faith."* It certainly cannot be contended that the railroad company erecting fences on the granted lands have done so "without claim or color of title made or acquired in good faith;" and it is only to such erections and inclosures that the act applies.