NORTHERN PAC. RY. CO. v. DUDLEY et al.

(Circuit Court, D. Idaho, N. D. April 10, 1897.)

No. 98.

1. INDIAN RESERVATION—RESTORATION TO PUBLIC DOMAIN.

The effect of the various steps taken by the government in reference to the Cœur d'Alene Indian reservation, in northern Idaho, including the act of March 3, 1891, and the two treaties ratified by it, was to withdraw it from the operation of the prior grant of alternate sections to the Northern Pacific Railway Company, and to restore the northern portion of the reservation to the public domain.

2. SAME—TITLE BY GENERAL OCCUPANCY.

While the title of the Cœur d'Alene Indians to their lands in northern Idaho, when the Northern Pacific Railway Company fixed its line of general route, was only that of general occupancy, and constituted no barrier as against the government, it was so far valid that no other party could disturb it without the consent and authority of the government.

3. RESTORATION OF LAND TO PUBLIC DOMAIN—CONSTRUCTION OF STATUTE.

Section 22 of the act of March 3, 1891, providing that "all lands" sold or released to the government by both agreements with the Cœur d'Alene Indians therein referred to· (with certain exceptions) should be restored to the public domain, is not to be literally construed, but refers only to those released lands which had been a part of the reservation.

4. LAND GRANT—FORFEITURE.

Even assuming that but for the act of March 3, 1891, restoring lands, released by the Cœur d'Alene Indians, to the public domain, they would pass to the Northern Pacific Railway Company under the act of July 2, 1864 (13 Stat. 365), the failure of the company to comply with its contract as to the time of completing its road, as embodied in section 8, as amended, would preclude it from complaining of the act of restoration.

This was a suit in equity by the Northern Pacific Railway Company against Alton P. Dudley and others. The cause was heard on motion for an injunction pendente lite to prevent the cutting of timber from the lands in controversy.

Dudley, Bunn & Dudley, for complainant.

BEATTY, District Judge. The complainant seeks pendente lite an order restraining defendants (who were numerous) from cutting or removing any timber from the lands involved in this action, claiming that they are a part of the grant by the government to the Northern Pacific Railway Company. The counsel, who it was expected would represent the defendants, sent notice, at the time of the hearing, that they would not appear, nor did any counsel represent them; but as they are settlers upon these lands in good faith, and after the public announcement by the government that they were public, and subject to settlement and occupation by its citizens, it is deemed proper that all phases of the questions involved should be carefully examined, rather than treat the defendants as in default.

Among the facts and statutes which are pertinent in the consideration of the case are: First. The act incorporating the Northern Pacific Railway Company, approved July 2, 1864 (13 Stat. 365), through which it is provided, by section 2, that "the United States shall extinguish, as rapidly as may be consistent with public policy and the welfare of the said Indians, the Indian title to all the lands falling under the operation of this act"; by section 3, "that there be and hereby is granted to the Northern Pacific Railroad Company * * * every alternate section of public land, not mineral, designated by the odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line, * * * whenever on the line thereof the United States have full title not reserved, sold, granted, or otherwise appropriated and free from pre-emption or other claims or rights at the time the road is definitely fixed"; by section 8, first amended by the act of May 7, 1866 (14 Stat. 355), and finally by the act of July 2, 1868 (15 Stat. 255), to read as follows: "That each and every grant, right and privilege herein are so made and given to, and accepted by said Northern Pacific Railroad Company, upon and subject to the following conditions, viz.: that the said company shall commence the work on said road within two years from and after the 2nd day of July, 1868, and shall complete not less than one hundred miles per year after the second year thereafter, and shall construct, equip, furnish and complete the whole road by the 4th day of July, Anno Domini 1877;" and, by section 20, that "congress may, at any time, having due regard for the rights of the said Northern Pacific Railroad Company, add to, alter, amend or repeal this act." Second. On November 8, 1873, by executive order, the Cœur d'Alene reservation, in northern Idaho, within the limits of which these lands are, was defined and set apart for the Cœur d'Alene Indians. Third. Pursuant to provisions made by congress, two different commissions were appointed to treat with these Indians concerning their lands in the territories of Montana, Idaho, and Washington, the result of which will be found in the two agreements with them, dated, respectively, March 26, 1887, and September 9, 1889, both ratified by congress by the act of March 3, 1891 (26 Stat. 1026). By the first agreement, for a consideration of $150,000, the Indians ceded to the government their title, which was that of general occupancy only, to all their lands in said territories, except that within said reservation; and by article 5 it was agreed that said.

"Cœur d'Alene reservation shall be forever held as Indian land and as homes for the Cœur d'Alene Indians, * * * and no part of said reservation shall ever be sold, occupied, open to white settlement, or otherwise disposed of, without the consent of the Indians." By article 1 of the second agreement (page 1030), for the further consideration of $500,000, the Indians ceded to the government the northern part of their reservation, in which are situated the lands in controversy; and by section 22 of such act it is provided "that all lands so sold and released to the United States, as recited and described in both said agreements, and not heretofore granted or reserved from entry or location, shall, on the passage of this act, be restored to the public domain, and shall be disposed of by actual settlers only." Fourth. From complainant's bill it appears that the railroad company fixed, on February 21, 1872, its line of general route, and, on August 30, 1881, its line of definite route; that the road was constructed and completed from a point in Washington, through Idaho, to a point in Montana, during the years 1881, 1882, and 1883; and that on June 9, 1894, the commissioner of the general land office instructed the local land officers that these lands were open to settlement, and to allow entries thereof under the land laws.

Examination of the facts in this case recalls how a most pacific and intelligent tribe of Indians, who had long manifested their friendship for the white race, were greatly neglected, and their appeals to congress for an adjustment of their claims and the security of their homes from intrusion were overlooked, while the interests of more warlike and savage tribes were promptly settled. So far as attention has been directed, nothing was done by congress for more than 10 years in recognition of the reservation set aside for the Indians by the president in 1873; but nothing was done to disapprove or revoke the order, and the Indians acted upon and accepted it, by moving upon and since continuously occupying the reservation. Congress did, on March 3, 1885 (23 Stat. 380), recognize it by making an appropriation for certain expenses attending it, and also by several subsequent acts, and finally, by that of March 3, 1891, its selection as such reservation was fully ratified. Even if the executive order was without the authority of law, although within the rule of a long line of precedents, the facts and acts connected with it may constitute it a lawful reservation from the time it was first so dedicated, in 1873. To some extent such view is supported by Buttz v. Railroad Co., 119 U. S. 70, 7 Sup. Ct. 100, but it is immaterial whether this is so or not, for prior to the location of the reservation the company had fixed its line of general route, at which time the only Indian title upon any of the lands within the reservation or the railroad grant was that of general occupancy, and whatever title the company may have ever acquired to any of the reservation lands had its inception at the time the general route was fixed. This Indian title of occupancy, however, was such an incumbrance on the lands as absolutely prevented their enjoyment by the railroad company. It is true, as against the government, it constitutes no barrier, and it has always been unceremoniously brushed aside when in conflict with the government's interest; but, at the same time, it

has been considered a title so sacred and valid that no other party can ever disturb it without the consent and authority of the government. The company then took these lands subject to this Indian title of general occupancy, but with the agreement of the government to extinguish it as rapidly as consistent with public policy and the welfare of the Indians; but the "manner, time, and condition of its extinguishment were matters solely for the consideration of the government, and are not open to contestation in the judicial tribunals." 119 U. S. 66, 7 Sup. St. 104. There is nothing in the act implying that this title would be extinguished by the removal of the Indians beyond the limits of the railroad grant. On the contrary, a due regard for their welfare, as well as the dictates of humanity, would suggest that some place within the country they had long claimed and occupied should be selected as their permanent home, and this must have been contemplated by all parties at the passage of the act. What was effected by the said act and the two treaties ratified by it was the cession by the Indians of all their title and claim to that large tract of country which they had occupied, except only that portion thereof within the reservation, which it was agreed should forever remain theirs. The title retained by or granted to them may not have been a technical fee, but it was its equal in value, for it was an exclusive possession for all time. So far as the government was concerned, it was a conveyance to them of all its title, and was such a title in them, such an appropriation, such a reservation of the land, as would, while it existed, exclude any other subsequent sale or disposition thereof without their consent; nor can there be any question that, had it existed prior to the time when the railroad grant should attach, it would have been superior to and have excluded it.

But, if the government intended by its action to supersede the railroad grant, the question remains whether it had the power to do so. By St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 18, 11 Sup. Ct. 389, it is at least intimated that it may; and by said section 20 of the act of 1864 the right was reserved to the government at any time to alter, amend, or repeal the act, but to do so with due regard for the rights of the railroad company. But is not the government to determine what those rights are, in what manner they shall be protected, and did it not exercise due regard for them when, by the payment of a large amount of money to the Indians, and granting to them this reservation, it removed the incumbrance of the Indian title of general occupancy to all the other lands within the grant? I am of the opinion that the acts of the government in this matter resulted in the entire withdrawal of all the lands within the reservation from the operation of the grant, and that it had the same effect as though it had been done prior to the time when the general grant to the company took effect. In other words, so far as these reservation lands are concerned, all right that the company may have ever had to them by virtue of its grant was canceled so absolutely that all title thereto rested either with the Indians or the government. By the second treaty named, the Indians ceded to the government all their title. This did not operate to revive any claim

or right of the company under its grant (that had been extinguished), and, as to these lands, was as if it had never existed, thus adding the lands to the public domain. Bardon v. Railroad Co., 145 U. S. 539, 12 Sup. Ct. 856. In opposition to this view, 119 U. S. (7 Sup. Ct.) is cited; but the lands in question in that case had never been a part of a reservation, or subject to any incumbrance, save that of this Indian title of general occupancy, upon the extinguishment of which, without any conditions or other known reservations or grants, the full title would undoubtedly at once rest in the company.

Congress considered that the company's title to these lands had been extinguished; for, in the same act in which these agreements were ratified, it provided, by section 22, that they should be restored to the public domain. The court would not be justified in holding this congressional act void, except upon very clear and positive conviction that it is so. Also, the land department has so construed the act; and, while the views of these officers are not a law unto the court, it has frequently been held that they are "always entitled to the most respectful consideration, and ought not to be overruled without the most cogent reasons." U. S. v. Moore, 95 U. S. 763. This section 22 is not free from obscurity. It says all the lands sold and released to the United States by both agreements are restored to the public domain. Congress could not have intended this to be literally construed, but meant it to apply only to those released lands which had been a part of the reservation. It is contended by the complainant that the clause "not heretofore granted or reserved from entry or location" was intended to include the odd-numbered sections granted to the company by the incorporation act, as lands "reserved from entry or location." It would seem that, if congress had thus intended, it would have used more apt language, instead of using those terms which are usually understood to apply to lands located by private entry and claim under the general land laws. The most reasonable construction of this enactment is that congress intended to remove all question of doubt as to the claim of the railroad company to any of the reservation lands, and to restore all to the public domain, except such thereof as may have been lawfully claimed by private entry or settlement of citizens.

In the recent case of Railroad Co. v. Mingus, 165 U. S. 413, 17 Sup. Ct. 348, the supreme court held that the railroad company was not in condition to complain of the forfeiture by congress of a part of its land grant, because it had failed to complete the road within the time limited by law. In the case at bar the company was required to complete its road by July, 1877, but did not do so until 1881 to 1883. Even if it be admitted that, but for the act of congress restoring these lands to the public domain, they would pass to the company upon the removal of all Indian title, its failure to comply with its contract as to the time of completion, which is made, by said section 8, one of the express conditions upon which all its rights are based, precludes its complaint of this act of restoration. It appears from the record that so long since as June, 1894, the land department publicly announced that

these lands were open to settlement. Since then settlers have in good faith been locating upon them, and in the meantime the company has delayed bringing its action. Under all the circumstances, I think the defendants should not be disturbed until, at least, some higher court can consider the cause. The injunction is therefore refused.