Booth, J.,
delivered the opinion of the court.
This is a demurrer to claimant’s petition. The Missouri, Kansas & Texas Railway Co., claimant herein, is a Kansas corporation and was originally incorporated under the name of Union Pacific Railroad, Southern Branch. In 1870, by *68 the consent and approval of the Kansas Legislature, it assumed its present name and has retained it since. Claimant company is a land-grant road, and as such is here claiming the benefits of a land-grant act passed July 25, 1866. On March 3, 1863 (12 Stats., 772), Congress granted certain specified sections of the public lands in Kansas to that State to aid in the construction of a railroad from Atchison on its eastern border, via Topeka, the capital of the State, thence across the entire State to its western boundary. The same act provided for a branch line extending from what is now Emporia, Kans., down the Neosho River Valley to intersect with the line of the Leavenworth, Lawrence & Fort Gibson Railroad. The grant of public lands contained in the act was accepted by the Atchison, Topeka, & Santa Fe Railway Co. upon certain conditions, one of which was a concession with a similar grant to construct a branch line northward from Emporia to intersect the Union Pacific Railroad, Eastern Branch, at Fort Riley (now Junction City, Kans.). On July 1,1864 (13 Stats., 339), Congress extended the grant of 1863 to the northern branch, and the Atchison, Topeka & Santa Fe Co. accepted the same. The Atchison, Topeka & Santa Fe Co. constructed the main line across the State from east to west, but did not construct the branch lines. On March 19, 1866, the Atchison, Topeka & Santa Fe assigned to claimant company all its right, title, and interest in the grant respecting the branch lines, and the claimant company, with the consent of the Kansas Legislature, accepted the grant and assumed its obligations. The claimant company’s original articles of incorporation intended the construction of a railroad from Fort Riley on the line of the Union Pacific, of which system it was then a part, southward through the Neosho River Valley to the southern boundary of Kansas, with power to extend its line across Indian Territory. In 1866 and before the grant had been earned under the acts of 1863 and 1864 the Congress, on July 25, 1866, passed two acts, one on July 25, 1866, and the other the following day, July 26,1866. Rights under the last statute are not involved here, the act of July 25, 1866 '(14 Stats., 236), being the one upon which the claimant company predicate their case. The granting clauses of these *69 two subsequent statutes did, however, materially modify the terms and conditions of the former acts of 1863 and 1864 respecting the Neosho Valley lines. The first section of the act of 1866 granted to the State of Kansas, for the use and benefit of the Kansas & Neosho Valley Railroad Co., a Kansas corporation, every alternate section of land, or parts thereof, designated by odd numbers, to the extent of 10 sections per mile on each side of said road, to be selected within 20 miles of the line of said road, with power and authority given to select indemnity lands in cases where the United States had previously disposed of any of said sections by sale, preemption, or homestead entries. The usual clauses as to previous reservations, railroad rights of way, etc., were included in the act. The purpose of the grant was to aid in the construction of a railroad from the eastern terminus of the Union Pacific, on the line between Missouri and Kansas, thence southward across the eastern tier of counties in said State, with an ultimate view of connecting at Red River, at or near Preston (now Denison), Tex., with a railroad then in ararse of construction from Galveston, Tex., to that point. In furtherance of this comprehensive scheme of railroad building, section 9 of the act of July 25, 1866, provided “ that the same grants of lands through said Indian Territory are hereby made as provided in the first section of this act, whenever the Indian title shall be extinguished by treaty or otherwise, not to exceed the ratio per mile granted in the first section of this act: Provided, That the lands become a part of the public lands of the United States.”
Section 11 of the act of 1866 provided, among other things, as follows:
“ That should the Leavenworth, Lawrence and Fort Gibson Railroad Company, or the Union Pacific Railroad Company, Southern Branch, construct and complete its road to that point on the southern boundary of the State of Kansas where the line of the said Kansas and Neosho Valley Railroad shall cross the same, before the said Kansas and Neo-sho Valley Railroad Company shall have constructed and completed its said road to said point, then in that event the company so first reaching in completion the said point on the southern boundary of the State of Kansas shall be au *70 thorized, upon obtaining the written approval of the President of the United States, to construct and operate its line of railroad from said point to a point- at or near Preston, in the State of Texas, with grants of lands according to the provisions of this act * *
The claimant company, acting under said act, entered upon the construction of its road, and was the first of the competing lines to reach the point designated in the act. On July 22, 1870, it was formally notified of its rights under the statute and duly authorized upon compliance with certain formalities to proceed with the construction of its road through Indian Territory.
The petition alleges, and it is not here open to dispute, that it did proceed with reasonable dispatch to complete its line through Indian Territory, and that the same was accepted and approved by the proper officers of the Government as a compliance with the statute in 1873. The petition further alleges that, in pursuance of a general governmental policy, the United States, through Congress, the executive departments, the Secretary of the Interior, the Commission to the Five Civilized Tribes, and the various town-site commissions, has extinguished the Indian title to said lands by treaties and legislation relative thereto; that the greater portion of said lands have been allotted to the individual Indians belonging to said tribes, patents issued therefor, and the unallotted lands sold by the defendants to purchasers other than Indians and otherwise disposed of, irrespective of claimant’s right and title thereto, and despite its repeated protests to each and all the proceedings. The petition concludes with the averment that the United States has extinguished the Indian title to all of said lands embraced within its grant; that said lands did become a part of the public lands of the United States; that the United States not only failed to carry into execution its obligations under the act of July 25, 1866, but by allotting to said Indians and otherwise selling and disposing of said lands, made the performance of the contract impossible upon its part, thereby depriving the petitioner of 3,114,368 acrés of land of the value of $61,287,800, for which amount it asks judgment.
*71 The issue raised by defendants’ general demurrer involves the construction of the act of July 25, 1866, defendants contending that under the allegations of the petition the lands claimed for never became public lands within the intention of the parties; that the Indian title to said lands if extinguished was done in pursuance of previous valid subsisting treaties so to do; that the grant to claimant company was not in frcBsenti, but more in the nature of a promise of a grant to be made in futuro upon the happening of certain contingencies.
The statute is anomalous. A land grant act containing similar terms and conditions has not been shown the court, and doubtless none exists. The general purpose of the legislation is not difficult to ascertain. The Congress evidently was concerned in aiding and thereby procuring a connecting line of railroad extending from the main line of the Union Pacific to the Gulf of Mexico. The Civil War and the advancing settlement of the West had demonstrated its necessity. To facilitate its construction the eleventh section of the act sets up a competition between substantially three parallel lines and offering as the inducement an additional extensive land grant through an undeveloped country, every acre of which was in the possession of and inhabited by Indians and known as Indian lands.
There is nothing, however, in the terms of the statute, or the peculiar circumstances surrounding its enactment, which would seem to exempt the application of the usual rules heretofore applied by the Supreme Court in construing statutes of a similar character. It comes within the purview of what are commonly designated “ land grant acts;” its purpose was the same, though worded in a way to meet the exigencies of the then situation of the parties. The Supreme Court, in a long line of decisions extending over the entire range of land grant legislation in aid of railroads, has uniformly held that grants of this description are to be construed most strongly against the grantee; that nothing passes except by the explicit terms of the grant, keeping in mind that the conveyance is by act of Congress, which is always susceptible to a construction in consonance with legislative intention. {The Dubuque and Pacific Railroad *72 Company v. Litchfield, 23 How., 66; Slidell v. Grandjean, 111 U. S., 437; Rice v. R. R. Co., 1 Black., 360; Leavenworth R. R. v. United States, 92 U S., 733, 739.)
In the last cited case, wherein a grant through Indian lands was directly involved, Mr. Justice Davis used this language in reference to its construction:
“ This grant, like that to Iowa, was made for the purpose of aiding a work of internal improvement, and does not extend beyond the intent it expresses. It should be neither enlarged by ingenious reasoning nor diminished by strained construction. The interpretation must be reasonable, and such as will give effect to the intention of Congress. This is to be ascertained from the terms employed, the situation of the parties, and the nature of the grant. If these terms are plain and unambiguous there can be no difficulty in interpreting them; but if they admit of different meanings — one of extension and the other of limitation — they must be accepted in a sense favorable to the grantor; and if rights claimed under the Government be set up against it they must be so clearly defined that there can be no question of the purpose of Congress to confer them. In other words, what is not given expressly or by necessary implication is withheld.”
Subsequently, in Winona & St. Peter R. R. Co. v. Barney (113 U. S., 625), Mr. Justice Field, in construing certain acts granting public lands to the State of Minnesota to aid in the construction of railroads, condensed in a few words the rule directly applicable to the present case:
“ The solution of these questions depends of course upon the construction given to the acts making the grants, and they are to receive such a construction as will carry out the intent of Congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance. To ascertain that intent we must look to the condition of the country when the acts were passed as well as to the purpose declared on their face and read all parts of them together.”
The courts have uniformly held in construing land-grant legislation, where the donation is a portion of the unencumbered public lands of the United States, that the grant was in prcesenti to take effect upon the specific tracts when the line of the road is located; the grant then becomes cer *73 tain and reaches back to the date of the act, having been a float until the line of the road is definitely fixed.
In construing grants cum onere, especially where the outstanding title or encumbrance was the Indian right of occupancy, a different rule has obtained, and it would be difficult to say from a review of the authorities that the grant in each instance was in prmenti subject to the encumbrance. The Congress respecting legislation wherein Indian lands and reservations were known to have been invaded by land grants has almost uniformly provided specifically as to them, either obligating itself to extinguish the title, as it did in the Pacific railroad grants and other acts of similar character, or withholding the attachment of the grant until the Indian title has been extinguished. The Indian lands were, in the absence of express words of reservation, excepted from the operation of the grant by the general provisions found in all land-grant acts reserving lands previously disposed of by the United States by preemption or homestead entries or for any other purpose whatever. In the Leavenworth case (supra) the Supreme Court held that even in the absence of such reservation title would not attach to lands of this character. In the acts of March 3, 1857 (11 Stat., 196), July 1, 1862 (12 Stat., 491), July 2, 1864 (13 Stat., 364), July 2, 1864 (13 Stat., 367), July 25, 1866 (14 Stat., 236), July 26, 1866 (14 Stat, 289), where it was apparent that the line of the railroad must pass over Indian lands, express provisions were made respecting their reservation and the extinguishment of title. In all these instances cited above the United States either withheld the grant until the Indian title was extinguished or expressly agreed to extinguish it for the purposes of the act. In Buttz v. Northern Pacific Railroad (119 U. S., 55) the Supreme Court held that the grant although through Indian lands was in prmenti passing the fee subject to one condition only. In the Buttz case, however, there was an express agreement to extinguish the Indian title. In the cases where no such express obligation rested upon the Government it has been settled beyond dispute that the grant of Indian lands is in the nature of a float conditioned upon the extinguishment of Indian title, the time, manner, and con *74 ditions of extinguishing such Indian title resting exclusively in the United States free from interference or contest by private parties. (Butts v. Northern Pacific Railroad, supra; St. Paul, etc., Railway Co. v. Phelps, 137 U. S., 528-541.) It may then, we think, be asserted that the general rule respecting the construction of land-grant acts rests primarily in the intent of the Congress in the passage of the law, and whether the title conveyed was one in prcesenti, futuro, or a conditional promise to convey must be ascertained by taking into consideration the circumstances of the transaction, the condition of the country, and the situation of the parties at the time of -the donation. The general rules as to statutory construction prevail; for while the act is treated as a conveyance it is no less a law of the United States and as such subject to the ascertainment of legislative intent.
The Indian title was one of occupancy, the fee was in the United States, and the right of conveyance was limited to the United States or to others by their express consent. This rule has prevailed since the first litigation involving the subject and has never been departed from in any case. (Johnson v. McIntosh, 8 Wheat., 543; Jones v. Meehan, 175 U. S., 1; United States v. Winans, 198 U. S., 371.) While the Indian title was limited to the use and occupation of the lands and they were held in communal ownership, still it was such a title as the United States, in theory at least, fully respected and generally protected in its dealings with the respective tribes. The question of Indian title and Indian rights has been so frequently before the courts that it is needless to multiply citations supporting this contention.
The statute of 1866, passed as it was at the close of the war, evidently induced in part at least by the limited transportation facilities available to the Government during that crisis, sought to promote the' construction of an extensive railroad line connecting the South with the East and West. In the consummation of the project and in the interest of time, the Government availed itself of the existence of three railway companies, all of which were incorporated and pursuing a course directly in harmony with the purposes of the act. The country through which the major portion of the *75 line must pass was Indian country in the possession of the Indians and had been for many years. The Creek Indians acquired their lands in Indian Territory in 1834, the Choctaws in 1830, and the Cherokees in 1828. They had been removed in accord with treaty stipulations, by the terms of which each tribe had ceded to the Government vast areas of land in the more populous East in exchange for these lands in the West. No doubt at the time of their removal the Government thought they had selected for the Indians a new habitat ideal in nature and extent; the country was a vast wilderness, absolutely undeveloped and then considered beyond the range of immediate setlement by the whites. The United States at this time and at the time of the passage of the act of July 25,1866, treated Indian tribes as a dependent sovereignty under the supervision, guardianship, and control of the United States, but still accorded them sufficient autonomy to regulate their own tribal affairs and enforce their own peculiar tribal laws and customs. Innumerable treaties were made with the representatives of the tribes; the negotiations therefor were as solemnly carried on as with a foreign nation. The title to and dominion over their tribal lands was accorded the same respect as though possessed in fee simple, and the United States always^ without a single exception brought to our attention, either purchased the Indian land for a money consideration or ceded public lands in exchange for those acquired. It was the policy of the Government in 1866 to acquire Indian lands wherever it could in the interest of civilization, and to remove the Indian to some distant reservation carved out of other public lands. The presence of so many Indian tribes in the western country was the result of this policy, and the United States no doubt anticipated, and had a right to anticipate, that such a course might follow in reference to the lands granted in the act of July 25, 1866. Whenever Indian tribal lands were acquired by treaty or otherwise they were made part of the public domain and thrown open to settlement by preemption and homestead entries.
What was the situation of the parties at the time? All but one of the tribes occupying the lands in issue had joined the Confederacy during the war; it therefore became neces *76 sary to readjust their tribal status. The Government by three separate treaties, signed April 28,1866 (14 Stat., 769), June 14, 1866 (14 Stat., 785), and July 19, 1866 (14 Stat., 799), covenanted, among other things, to secure said Indians in their title to their lands, and that whenever it was for their best interests the same would be.allotted in sev-eralty among them. These treaties, antedating the granting act here in issue but a few days, assuredly negative a governmental intention to grant to another a right just previously given under solemn treaty stipulations and at a time when the making of Indian treaties prevailed in the Government’s intercourse with the Indians. The inference is irresistible; if otherwise, we must challenge the good faith of the United States in a transaction involving national honor. The United States could not grant the lands and respect the treaties unless it interposed conditions; the claimant company was not ignorant as to the situation. The United States did not agree to extinguish the Indian title; it had too recently confirmed it; nothing was left for the United States to do but what it did do. By the ninth section of the act, in language clearly prospective, it expressly annexed two conditions either one of which might defeat the grant, and in so doing followed its long-continued Indian policy and its land-grant policy of only granting absolutely public lands to aid in the construction of railroads. The United States had the absolute power to grant these lands, but certainly not the disposition so to do. ' That they stood in a different position in reference to them is clearly indicated by the anomalous provisions of the act and their failure to assume the responsibility of extinguishment of title.
Subsequent to the passage of the act a different policy was inaugurated by the United States with respect to Indian tribes and tribal lands. Being substantially contemporaneous with the act, it may have then been anticipated. In 1871 the United States discontinued its recognition of Indian tribes as dependent sovereignties and the Congress assumed control. Treaties were no longer negotiated, and a comprehensive scheme was adopted involving the ultimate dissolution of the tribes, the allotment of their lands, and the citizenizing of the individual Indian. The western *77 country was rapidly becoming more populous, settlements of considerable size were being erected, public lands were enhancing in value, and the demand therefor rapidly increasing. Territories were seeking admission into the Union, and Indian reservations, usually considered a menace to great advancement, were condemned by the public sentiment of the times. The Indian tribes themselves were becoming more and more adverse to continued removals and the Government finding it more than difficult to find new locations out of the public domain upon which to relocate them.
In 1884 (23 Stat., 96) an Indian residing on the public lands of the United States was permitted to avail himself of the homestead laws.
In 1887 (24 Stat. L., 388) a most comprehensive law was passed providing for the allotment of Indian lands in sever-alty to Indian tribes residing on Indian reservations, and conferring on them» the rights of citizenship. This statute did not reach the Indian tribes concerned in this suit; the reason therefor will appear hereafter. In 1889 (25 Stat. L., 783) a United States court was established in Indian Territory and its jurisdiction defined. In March, 1889, the entire western half of Indian Territory was ceded to the United States by the Indians then in possession thereof, out of which lands the Territory of Oklahoma was established in 1890. In fact, legislation too extensive to review was enacted at each session of the Congress tending toward the plainly expressed purpose to ultimately discontinue the previous relationship of the United States toward its Indian tribes. (Lone Wolf v. Hitchcock, 187 U. S., 553, 25 Stat. L., 642).
In March, 1893 (27 Stat. L., 645), by the sixteenth section of the general appropriation act for the Indians, the Congress provided for a commission to negotiate with the Creeks, Chickasaws, Choctaws, and Cherokee Indian tribes— tribes exempt from the act of 1889, supra, and the tribes whose lands are concerned in this suit — looking toward a dissolution of their tribes and a cession or allotment in severalty among them of their lands. While the expressed purpose of the law was to ultimately create a State of the Union out *78 of the territory inhabited by the Indian tribes, it likewise was in entire accord with the general Indian policy of the Government. The commission appointed under this act, commonly known as the Dawes Commission, proceeded to the negotiations with the Indians and finally, after several years, secured agreements from the respective tribes as to the terms and conditions upon which they would willingly submit to a disposition of their landed interests. The Creek agreement was ratified by the Congress in 1901 (31 Stat. L., 861), the Choctaw and Chickasaw agreement in 1902 (32 Stat. L., 641), and the Cherokee agreement in 1902 (32 Stat. L., 716). Under these agreements the lands of the tribes mentioned were allotted to them in severalty, with certain exceptions as to town sites, school and church lands, etc. Some wholesome and precautionary reservations were made of mineral lands, but the entire body of Indian lands, with these exceptions, became the individual property of the individual Indian in severalty, being conveyed to the allottee by the joint act of the Indian and the Government.
While in a strict and technical sense the possessory title of the Indians was by this legislation extinguished, the United States was not the beneficiary; no provision of the law vested in the Government the united title of itself and the Indians. The transition was directly the opposite; the Government divested itself of whatever title it possessed and by a united conveyance merged the lesser and the greater estate in the allottee. The Indian title was only extinguished in the sense that the Indian acquired the outstanding title of the Government and by this act merged a posses-sory right into a fee simple. The Indian continued in possession. It is true his estate was partitioned and his possession limited by metes and bounds, and the communal ownership of the lands destroyed, but the United States did not at any time by any provision of the law acquire the Indian title or any dominion over the lands which it did not already possess before the transaction. It was not the extinguishment contemplated by the act in order to vest title by its terms.
What was intended by the proviso to section 9 of the granting act “Provided, That said lands become a part of *79 the public lands of the United States ” ? The usual office of a proviso to a statute is too well known to require repetition. If the term “ public lands,” as used in the statute, is to receive the meaning accorded it in treaties and public laws, it means “ such land as is subject to sale or other disposal under general laws.” (Newhall v. Sanger, 92 U. S., 761-763; United States v. Thomas, 151 U. S., 577-583; Northern Lumber Co. v. O'Brien, 139 Fed. R.., 616.) It has been suggested that the extinguishment of the Indian title and the lands becoming public lands are synonymous terms, and that the lands having been public lands previous to Indian occupancy nothing afterwards supervened to change their character except the incumbrance of the Indian title. The contention is in a measure correct, but the subvention of Indian title by means of treaty stipulation, a contract equally as sacred as the act of July 25, 1866, and for which a consideration proportionately as great passed, changed the character of the lands; they were no longer part of the public domain subject to disposal under general laws, and in the absence of express and explicit language did not pass under land-grant laws, even though not expressly reserved. It did not require a public survey to make them public lands, and upon the extinguishment of the Indian title if within the intent of the act they would have passed under the grant, for the railroad had long since definitely located its line of road.
The proviso was inserted for some purpose; it was not surplusage; it had some definite intent. In view of what has been said, it seems to have met a situation, whether anticipated or not, in strict accord with the policy of the United States in its relations to Indian tribes. The United States, in the act making the grant to claimant company, was in no position to convey immediate title; it did not even know when, how, or in what manner it might ever convey the same, and it wisely circumscribed the grant by conditions not only that the Indian title should be extinguished but that the lands should again become part of the public domain, owned absolutely by the United States, free from incumbrance of any kind or character, and subject to its *80 disposition without invading the rights of others or violating its obligations with respect thereto.
. It is not to be presumed that the United States would, by treaty stipulations, provide lands for tribal Indians, an unlettered and dependent people, and at the same time enact legislation which by its express terms would incapacitate it from disposing of said lands in,the very maimer they had expressly agreed to do. The successive acts by which the Indians received their allotments in severalty were, in effect, agreements between the Indians and the United States. The Indians did not cede title to the United States, and, if they did, it was in pursuance of an agreement not to throw said lands open to public settlement, nor to allow the United States the absolute power of disposal, but to reconvey them to the Indians in severalty, making them in no event public lands in the sense in which that term is used in referring to that particular portion of the landed possessions of the United States. If they became public lands and claimant company’s grant attached, then the United States, in violation of express contracts, gave to the claimant company over 3,000,000 acres of' land belonging to the respective tribes concerned herein, which some of them had occupied and owned, as Indian tribes owned land, since 1828. That it did not so intend is evidenced by the twenty-seventh section of the act of April 26, 1906 (34 Stat., 148), wherein it is expressly stated that said lands shall not become public lands nor the property of the United States. It is more consistent with the circumstances of the grant to say that the proviso was inserted for the purpose of enabling the United States to discharge its obligations under the treaties of 1866 by distinguishing between lands which are simply the property of the United States and its public lands donated to settlers and others for the purposes of internal improvements. As before observed, “ if rights claimed under the Government be set up against it, they must be so clearly defined there can be no question of the purpose of Congress to confer them.” (Leavenworth case, supra.)
The Congress knew that in the course of time Indian tribal relations and Indian tribal lands must be segregated; that the existence of a large body of people holding im *81 mense areas of lands, free from local taxation, living thereon as a distinct and separate community, must yield to an advancing civilization. Governmental purposes required their absorption into the body politic of the nation, aside from their personal welfare. The Congress, knowing the difficulties attendant upon the extinguishment of Indian title and the acquirement of their lands, were not willing to rest the grant of 1866 upon that contingency alone, for it was certain to happen in one way or another, but added as precautionary legislation a clause which in nowise limited them in extinguishing Indian title, but did exempt them from liability if forced to extinguish it in a manner whereby the United States acquired nothing in property. If the proviso was meaningless, merely descriptive in character, the United States placed itself in a position whereby it must assume a great liability to the claimant company or abandon its right to deal with the Indians as public policy and the sentiment of the time demanded. The Government was willing, and by the language of the act intended, to grant to claimant the lands mentioned'in the act if they could by discharging their obligations to the Indians acquire this land as it usually acquired other public lands, in which event it could comply with the statute without loss to itself or incurring liabilities enormous in extent. We can not presume that the Congress did not know the extent of its liability if it rested the grant herein upon the first condition alone.
It is urged, however, that the particular portion of lands falling within the grant which were not allotted to the Indians are subject to the claimant company’s grant. It is true that quite a significant portion of the Indian Territory was not alloted to the individual Indians. Town-site commissions were appointed to survey, plat, and dispose of certain quantities of land for town-site purposes. The coal, asphalt, and mineral lands were segregated from allotment and leased and disposed of under salutary provisions of the law to secure their full value to the Indians; in fact, provision was made for the disposition of all surplus lands over :he allotments. The mode prescribed for the disposition of *82 these lands was not essentially different, in so far as transfer of title is concerned, from that used in the case of allotment. If they ever became public lands within the meaning of the statute so did the great body of lands allotted.
The United States and the Indian tribes joined in conferring upon certain commissions, upon each of which both were represented, power and authority to lay out the town sites as therein provided, and dispose of the lots so platted at auction. Schools were to retain their locations by paying a certain amount for their lands. Cemeteries could be established by the town authorities upon certain terms and conditions. The leasing and sale of mineral lands was wisely lodged in the Interior Department. Churches were to receive their lands gratuitously. The United States had the option to purchase suitable lands for the location of courthouses, jails, and other public buildings — a rather novel provision if the lands were public lands of the Government — and finally, as provided in sections 17 of the act approved April 26, 1906, supra, all the money arising from said sales, “ or from any source whatever,” was to be credited to said Indian tribes by the Treasury Department and thereafter paid to the Indians per capita. Public lands of the United States were not disposed of in this manner then, and they are not so disposed of now.
In pursuance of the general plan of allotment it was indispensable to take an equitable basis of distribution. In the agreements, ratified by Congress, it was fixed at a certain number of acres at a fixed price per acre and either the specified acreage was allotted or an increased or diminished allotment according to its appraised value. It was physically impossible to absorb the whole body of lands, even if desirable, and the surplus lands were disposed of with a view to continuing existing Indian towns and encouraging their enlargement. Indian villages had of course grown up in this large community; they were indispensable and the lands being held by communal title necessarily came within the Indian agreements with the United States. What has been said before applies to them; the United States never acquired title to them free from incumbrance; they were never conveyed or in any way ceded to the United *83 States. The very terms of the agreement fix their status, and though disposed of to other than Indians no part of the consideration ever reached the Treasury as funds belonging to the United States. The United States in fact transferred its title to the Indian and permitted the Indian to transfer it to another. Lands allotted to intermarried whites and former negro slaves were in the same category. The status of these people having been fixed by Indian laws it was carried into the agreement as to allotment; they did not take by preemption or homestead entries or by any manner similar to the ones used in disposing of public lands.
Again it is insisted that there rested upon the United States an implied obligation to extinguish the Indian title so the grant might attach; that the United States having prevented and made impossible of performance the condition it agreed to perform must respond in damages. It is indisputable that authority and power to deal with Indian tribes and Indian lands was lodged exclusively in the Government. The time and manner of disposition was exclusively for the United States, free from interference at the suit of private parties. If, then, an implied obligation rested upon the United States in this instance it was equivalent to saying we will extinguish title and make said lands public lands of the United States, and the* language of the act as qualifying terms was meaningless. There would have been no distinction between this grant and other grants wherein the United States expressly agreed to extinguish Indian title. The case is different from an ordinary execu-tory contract where one party refuses or renders' himself unable to perform a condition he impliedly engaged to perform. It can not be asserted that the United States impliedly engaged itself to extinguish the Indian title within a reasonable time; that was a matter within their exclusive right to determine; it could have continued the reservations indefinitely and no liability attached. It might never have extinguished Indian title and still be exempt. The condition was not one certain of performance; it was expressly contingent, and its performance was reserved exclusively to the grantor indeterminately.
*84 The United States recognized in the second condition its right to extinguish the Indian title without incurring liability. If responsible obligations are to be-implied the act simply postponed what was inevitable, and the claimant company was somewhat tardy in waiting forty-two years to assert its claim for damages for nonperformance of a condition within the power of the defendants to perform, and that within a reasonable time.
The Congress by the act of 1866 did not dp a “ vain thing.” The treaties with the Creeks, Cherokees, Choctaws, and Chickasaws consummated in 1866 reserved to the United States the right under certain conditions to grant extensive rights of way for railroad purposes through their lands. The act of 1866 transferred in almost identical terms this right to the successful competitor under the eleventh section of the act, and in addition thereto granted extensive areas of land in the State of Kansas, all of which was acquired by the claimant company. There was, no possible way for the claimant company, or either of its competitors, to connect their railroad lines and reach the coast via Preston (now Denison), Tex., except by permission of the Congress to pass through Indian Territory. The keenness of the competition and the subsequent disputes relative thereto appearing in claimant’s exhibits to its petition indicate the zeal of the competitors.
The claimant company accepted the grant with the conditions imposed, conditions which clearly expressed and intended to express the uncertainty of its complete realization. The United States from its very beginning had regarded its treaties with the Indians, and the court can not presume, nor in the absence of express language indicating an intent so to do, enlarge the terms of the granting act to cover, a vast area of land solemnly dedicated at the time of the grant to Indian tribes and for Indian purposes. If the United States so intended, apt language would have been employed, and terms of conveyance used in acts of similar character would have been used, leaving no doubt as to its purposes or what lands passed by the grant. Following the rules of construction heretofore set forth, we think the demurrer should be sustained. It is so ordered.