BURLINGTON NORTHERN
RAILROAD, Plaintiff,

v.

FORT PECK TRIBAL EXECUTIVE
BOARD, Fort Peck Tribal Tax Commission, Assiniboine and Sioux Tribes of
the Fort Peck Indian Reservation:
Kenneth E. Ryan, Tribal Chairman;
and Paula Brien, Tribal Secretary/Accountant, Defendants.

BURLINGTON NORTHERN
RAILROAD, Plaintiff,

v.

BLACKFEET TRIBE OF the BLACK-
FEET INDIAN NATION; Blackfeet
Tribal Business Council; Blackfeet Tax
Administration Division; Earl Old Person, Chairman; Archie St. Goddard,
Vice Chairman; Marvin Weatherwax,
Secretary; and Eloise C. Cobell, Treasurer, Defendants.

Nos. CV–87–055–GF, CV–87–120–GF.

United States District Court,
D. Montana,
Great Falls Division.

Nov. 23, 1988.

Michael E. Webster, Bruce R. Toole, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Mont., for plaintiff.

Harry S. Sachse, Marvin J. Sonosky, Reid Peyton Chambers, William R. Perry, Sonosky, Chambers & Sachse, Washington, D.C., Ray F. Koby, Swanberg, Koby & Swanberg, Great Falls, Mont., for Fort Peck Tribal Executive Bd., et al.

Jeanne S. Whiteing, Boulder, Colo., Phillip Roy, Donald Kittson, Browning, Mont., for Blackfeet Tribe of Blackfeet Indian Nation, et al.

## MEMORANDUM OPINION

HATFIELD, District Judge.

### A. THE ASSINIBOINE AND SIOUX TRIBES

The plaintiff, Burlington Northern Railroad, challenges the authority of the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana, to impose a tax upon the right-of-way occupied by the Railroad across the Fort Peck Indian Reservation. On May 15, 1987, this court granted the Railroad's request for preliminary injunctive relief, thereby enjoining the Tribes from levying the disputed tax upon the Railroad's right-of-way. The matter is

presently before the court on cross-motions for summary judgment for a determination of whether the Tribes should be permanently enjoined from attempting to levy a tax upon the Railroad's right-of-way.

## I.

On January 27, 1987, the Tribal Executive Board, as governing body of the Assiniboine and Sioux Tribes, enacted an ordinance implementing a tax known as a "utility property tax". The ordinance was designed to tax the property interests of public and private utilities using tribal trust lands on the Fort Peck Indian Reservation. In general, the tax rate is 3% of the value of the interest held. The ordinance was approved by the Area Director of the Bureau of Indian Affairs on January 28, 1987. The first tax assessments under the ordinance were sent to the taxpayers on April 15, 1987, with payment due by May 15, 1987. Before any taxes were collected, the Railroad brought this action seeking to invalidate the tax as applied to that entity.

The Railroad takes the position that because the right-of-way upon which it operates was established pursuant to an act of Congress, the Tribes have been divested of their sovereign authority to impose a tax with respect to that right-of-way. In the alternative, the Railroad seeks a declaration that the ordinance is null and void, as violative of the Commerce Clause of the United States Constitution and section 306 of the Railroad Revitalization and Regulatory Reform Act, Pub.L. 94–210, 90 Stat. 31 (49 U.S.C. § 11503). The Tribes, on the other hand, view the imposition of the tax as a legitimate exercise of their sovereign authority.

## II.

In *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed. 2d 21 (1982), the United States Supreme Court recognized the "power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management." *Id.*, at 137, 102 S.Ct. at 901. Referring to its earlier decision in *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 100 S.Ct.

2069, 65 L.Ed.2d 10 (1980), the Court reiterated that "[t]he power to tax transactions occurring on trust lands and significantly involving a tribe or its members is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status." 455 U.S. at 137, 102 S.Ct. at 901. The power of an Indian tribe to tax derives from the tribe's general authority, as sovereign, to control economic activity within its jurisdiction, and to defray the cost of providing governmental services by requiring contributions from persons or enterprises engaged in economic activities within that jurisdiction. 455 U.S. at 137, 102 S.Ct. at 901. Consequently, a tribe's interest in levying taxes on nonmembers is strongest when the revenues are derived from value generated on the reservation by activities involving the tribe, and when the taxpayer is the recipient of tribal services. 455 U.S. at 138, 102 S.Ct. at 902. Therefore, "a tribe has the power to tax nonmembers only to the extent the nonmember enjoys the privilege of trade or other activity on the reservation to which the tribe can attach a tax." 455 U.S. at 141–142, 102 S.Ct. at 903–904. The Court recognized, as evident, the fact that there exists a "significant territorial component to tribal power: a tribe has no authority over a nonmember until the nonmember enters tribal lands or conducts business with the tribe." 455 U.S. at 142, 102 S.Ct. at 904.

The rationale expressed by the Court in *Colville*, and expounded upon in *Merrion*, requires a tribal interest in the subject matter to justify a tribal tax. *See*, F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW, 433–434, n. 27. Use of trust land by a non-Indian supplies such an interest, but on fee land the interest must be based on other circumstances. *Id., citing, Collins, Implied Limitations on the Jurisdiction of Indian Tribes*, 54 Wash.L. Rev. 479, 508–21 (1979). In those precedential cases in which the use of tribal property by non-Indians was not involved, the tribal interest sufficient to justify a tribal tax upon non-Indians emanated from the fact that the non-Indians entered the reservation for the purpose of transacting

business with Indians. *See, Kerr–McGee Corporation v. Navajo Tribe of Indians,* 471 U.S. 195, 105 S.Ct. 1900, 85 L.Ed.2d 200 (1985); *Washington v. Confederated Colville Tribes, supra; Morris v. Hitchcock,* 194 U.S. 384, 24 S.Ct. 712, 48 L.Ed. 1030 (1904); *Buster v. Wright,* 135 F. 947 (8th Cir.1905), *appeal dismissed,* 203 U.S. 599, 27 S.Ct. 777, 51 L.Ed. 334 (1906).

In the matter *sub judice,* the Railroad concedes, as it must, the general power of the various Indian tribes to tax the transactions of non-Indians which occur on trust lands and significantly involve a tribe or its members. The court perceives the Railroad's challenge to the contested tax to be predicated upon its conclusion that the territorial component, essential to the valid exercise of the Tribes' taxing authority, is absent with respect to the subject right-of-way. The position of the Railroad is based upon its conclusion that the right-of-way is not tribal property and that the Tribes' interest in the operation of the railroad upon that right-of-way is insufficient to justify the imposition of a tribal tax.

The Tribes on the other hand, confident the right-of-way is properly considered reservation trust land, submit the tax must be sustained as a legitimate exercise of the Tribes' inherent sovereign authority. The Tribes see no legitimate basis upon which application of the tax to the Railroad's right-of-way can be distinguished from application of the tax to any other non-Indian business holding a possessory interest on reservation land. Tribal consent, the Tribes submit, was essential to the establishment of the right-of-way. The Tribes view the right-of-way as but an easement, with beneficial title to the land over which the right-of-way crosses remaining in the Tribes. The Tribes contend the implementation of the tax is a valid exercise of their sovereign authority to control economic activity within the tribes' jurisdiction. In the opinion of the Tribes, their possessory in-

terest tax is indistinguishable, in essence, from the tribal tax sustained by the Supreme Court in *Merrion.* The initial question to be addressed is whether Congress, in establishing the subject right-of-way, intended to extinguish the Tribes' beneficial title to the land comprising the right-of-way.

## III.

Analysis must obviously begin with a review of the history pertinent to the establishment of the subject right-of-way. Pursuant to the Act of April 15, 1874, 18 Stat. 28, Congress set apart a vast area of land in that area of the western United States, which is now the State of Montana, as the "Blackfeet" reservation for the "use and occupation" of numerous Indian tribes, including the Assiniboine and Sioux Tribes. By the Act of May 1, 1888, 25 Stat. 113, Congress established the present diminished boundaries of three Indian reservations, *i.e.,* Fort Peck, Fort Belknap and Blackfeet. The Act of May 1, 1888, represented the congressional ratification of, *inter alia,* a December 28 and 31, 1886, agreement between the United States and the Assiniboine and Sioux Tribes, whereby the Tribes ceded and relinquished all their right, title and interest in and to all lands embraced within the 1874 reservation, not specifically set apart and reserved as separate reservations for these Tribes. Between the time the 1886 Agreement was reached amongst the Assiniboine and Sioux Tribes and the United States, and the passage of the Act of May 1, 1888, ratifying that agreement, Congress passed the Act of February 15, 1887, 24 Stat. 402, which granted the subject right-of-way to the Burlington Northern's predecessor-in-interest. The right-of-way passed through lands of the 1874 reservation which were eventually included within the boundaries of the Fort Peck Indian Reservation as established by the Act of May 1, 1888.[1]

---

**1.** The Act of May 1, 1888, specifically addressed the grant of rights-of-way through the newly formed reservation in Article VIII which provided:

> It is further agreed that, whenever in the opinion of the President the public interests require the construction of railroads, ... through any portion of either of the separate

reservations established and set apart under the provisions of this agreement, right-of-way shall be, and is hereby granted for such purposes, under such rules, regulations, limitations, and restrictions as the Secretary of the Interior may prescribe; the compensation to be fixed by said Secretary and by him expended for the benefit of the Indians concerned.

Review of the history pertinent to the establishment of the Fort Peck Indian Reservation reveals that the Tribes' property rights in the reservation were established by specific acts of Congress. The Tribes, therefore, held full beneficial fee interest in the land comprising the right-of-way, as they did to all land comprising the reservation created by the Act of April 15, 1874. *See,* F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW, 477–485 (1982 ed.), and cases cited therein. As the Tribes readily recognize, however, the United States retains fee title to the land comprising all Indian reservations. *See, Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977).

▉ Consistent with the "plenary power of legislation" in regard to Indian affairs, Congress may extinguish tribal interest in real property subject to the stricture of the fifth amendment to the United States Constitution requiring just compensation for deprivation of property interests. *See, Shoshone Tribe v. United States,* 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937); *Choate v. Trapp,* 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912); *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). As emphasized by Chief Justice Marshall in *Johnson v. M'Intosh,* 21 U.S. (8 Wheat.) 543, 586, 5 L.Ed. 681, (1823) "the exclusive right of the United States to extinguish" Indian title has never been doubted. And whether it be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, its justness is not open to inquiry in the courts. *Beecher v. Wetherby,* 95 U.S. 517, 525, 24 L.Ed. 440 (1877). This precise point was reiterated by the Supreme Court in *United States ex rel Hualpai Indians v. Santa Fe Pacific Railroad,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941), wherein the court stated:

> Extinguishment of Indian title based on aboriginal possession is of course a different matter. The power of Congress in that regard is supreme. The manner, method and time of such extinguishment raised political, not justiciable, issues. *Buttz v. Northern Pacific Railroad,* 119

U.S. [55] at 66. [7 S.Ct. 100, 104, 30 L.Ed. 330]

Consequently, Congress has complete discretion to determine when to extinguish Indian title to reservation land thereby determining when the rights of a grantee to that land become possessory rights. *See, United States ex rel Hualpai Indians v. Santa Fe Pacific Railroad,* 314 U.S. at 347, 62 S.Ct. at 252. In ascertaining whether Congress elected to extinguish Indian title, the court is mindful of the Supreme Court's caution in *United States ex rel. Hualpai Indians v. Santa Fe Pacific Railroad:*

> But an extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards. As stated in *Choate v. Trapp,* 224 U.S. 665, 675 [32 S.Ct. 565, 569, 56 L.Ed. 941] the rule of construction recognized without exception for over a century has been that "doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith." (citations omitted)

*Id.,* at 354, 62 S.Ct. at 255.

More recently, in *Menominee Tribe v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), the Court reiterated that an intent to abrogate Indian rights would not be "lightly imputed to Congress", finding it difficult to conceive that Congress, without explicit statement, would subject the United States to a claim for compensation by destroying a Tribe's property rights. 391 U.S. at 413, 88 S.Ct. at 1711.

In determining whether Congress, in granting the subject right-of-way, intended to extinguish the Tribes' beneficial title to the land comprising the right-of-way, the court must examine the text of, and the legislative history attendant, the operative legislation, and consider the time and circumstances surrounding enactment of that legislation. *See, Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 587, 97 S.Ct. 1361,

1363, 51 L.Ed.2d 660 (1977); *see also, Mattz v. Arnett,* 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973); *Callejas v. McMahon,* 750 F.2d 729, 731 (9th Cir. 1984).

## IV.

The Burlington Northern construes the Act of February 15, 1887 as a grant *in praesenti,* which effectively extinguished the Tribes' beneficial interest in the land comprising the right-of-way. The Tribes, however, take the position that the right-of-way granted the Burlington Northern Railroad Company's predecessor-in-interest was simply an easement. Congress did not, the Tribes argue, intend to extinguish the beneficial title held by the Tribes in the land comprising the right-of-way. Rather, the Tribes submit, the right-of-way was negotiated by the Tribes via the 1886 Agreement and simply approved by the federal government through the enactment of the Act of May 1, 1888.

The Act of February 15, 1887, provided, in specific terms: "the right-of-way is hereby granted for the extension of its railroad through the lands set apart [by the 1874 Act] for the use of the [Tribes]." Act of February 15, 1887, § 1. The grant of the right-of-way was conditioned upon, *inter alia,* the Tribes being compensated in an amount to be determined by the Secretary of the Interior. In that regard, Section 4 of the Act of February 15, 1887, provided in pertinent part:

> No right of any kind shall vest in said railroad company in or to any part of the right of way herein provided for until plats thereof, made upon actual survey

for the definite location of such railroad ... shall be filed with and approved by the Secretary of the Interior, and until the compensation aforesaid fixed by the Secretary [for the Indians] has been fixed and paid....

Because the United States retained fee title to the land comprising the subject right-of-way, specific congressional authorization was necessary to effectuate the grant of the right-of-way to the Burlington Northern's predecessor in interest.[2] The Act of February 15, 1887, obviously accomplished that grant.[3]

The fact the Tribes held beneficial title to the land comprising the right-of-way would not, of course, have prevented the grant of Congress from operating to pass the right-of-way to the grantee. *See, Missouri, Kansas & Texas Railway Company v. Roberts,* 152 U.S. 114, 116–118, 14 S.Ct. 496, 497–498, 38 L.Ed. 377 (1894); *Buttz v. Northern Pacific Railroad,* 119 U.S. 55, 66, 7 S.Ct. 100, 104, 30 L.Ed. 330 (1886). In *Missouri, Kansas & Texas Railway Company v. Roberts,* 152 U.S. 114, 14 S.Ct. 496, 38 L.Ed. 377, the Court explained the authority of Congress in this regard:

> The United States had the right to authorize the construction of the road of the Missouri, Kansas and Texas Railway Company through the reservation of the Osage Indians, and to grant absolutely the fee of the two hundred feet as a right of way to the company. Though the lands of the Indians were reserved by treaty for their occupation, the fee was always under the control of the government; and when transferred, without reference to the possession of

---

**2.** The Act of March 2, 1899, granted the Secretary of Interior the general authorization to grant rights-of-way for railroads through Indian reservations. Act of March 2, 1899, Chapter 374, 30 Stat. 990 (25 U.S.C. § 312). Prior to the 1899 Act railroad rights-of-way through reservations were granted piecemeal, either by treaty provision, or by special statute providing for compensation to the Secretary of the Interior for the benefit of the Indians. F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW, 542, n. 135 (1982 ed.).

**3.** The creation of the reservation in 1874 made the March 3, 1875, General Railroad Right-of-Way Act (18 Stat. 482) inapplicable. In *Great*

*Northern Railroad Company v. United States,* 315 U.S. 262, 273–279, 62 S.Ct. 529, 533–536, 86 L.Ed. 836 (1942), the Supreme Court held, with respect to those portions of this same rail line for which the right-of-way was acquired by the railroad's predecessor-in-interest under the general right-of-way statute, Act of March 3, 1875, *see* 152, 18 Stat. 482, the Act granted "a present beneficial easement," but did not serve to convey fee title. The Tribes submit that *a fortiori,* a right-of-way grant across Indian trust lands carries no greater estate than the one over public lands. The court is unpersuaded that this simple deduction resolves the issue presented here for determination.

the lands and without designation of any use of them requiring the delivery of their possession, the transfer was subject to their right of occupancy; and the manner, time and conditions on which that right should be extinguished were matters for the determination of the government, and not for legal contestation in the courts between private parties. This doctrine is applicable generally to the rights of Indians to lands occupied by them under similar conditions. It was asserted in *Buttz v. The Northern Pacific Railroad Company*, 119 U.S. 55 [7 S.Ct. 100, 30 L.Ed. 330] and has never, so far as we are aware, been seriously controverted. In that case, the lands were within what is known as Indian country, where the right of the Indians to the occupancy of their lands was recognized; and in grants by the government of portions thereof for works of internal improvement, there usually was a stipulation for its extinguishment as rapidly as might be consistent with public policy and the welfare of the Indians. Such a stipulation was given when the grant under consideration in the case cited was made, showing that the government intended the grant to take effect notwithstanding any existing right of occupancy by the Indians, and it was deemed a sufficient expression of its intention to that effect. No such stipulation was made when the grant of the right of way through the Osage reservation was made, but the uses to which the lands were to be applied necessarily involved their possession. That grant was absolute in terms, covering both the fee and possession, and left no rights on the part of the Indians to be the subject of future consideration.

152 U.S. at 116–118, 14 S.Ct. at 497–498. Cognizant of this fact, the Tribes intimate that the passage of the Act of February 15, 1887, transferred the right-of-way subject to the Tribes' beneficial title. Therefore, the Tribes submit, the Burlington Northern is mistaken in its assertion that Congress intended the grant to be absolute in its terms, unencumbered by the Tribes' right of occupancy.

The Burlington Northern counters the Tribes' proposition with the suggestion that tribal assent was not a prerequisite to extinguishment of the Tribes' beneficial title. Emphasizing the fact the Act of February 15, 1887, predated the Act of May 1, 1888, by more than 14 months, the Burlington Northern asks the court to infer that Congress did not act pursuant to the Agreement of 1886 in granting the right-of-way.

■ The court is mindful of the fact that treaty making with Indian tribes effectively ended with passage of the Appropriations Act of March 3, 1871, Chapter 120, § 1, 16 Stat. 544, 566 (codified and carried forward at 25 U.S.C. § 71). *See*, F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW, 515 (1982 ed.) (citing examples). Nonetheless, while formal treaty making was abandoned, the federal government continued to make agreements with Indian tribes for the conveyancing of tribal lands, many similar to treaties, that were approved by both houses of Congress. *Id.* at 107. Regardless of the methodology employed by Congress in effectuating a grant or cession of an interest in tribal land, however, the authority of Congress to extinguish an Indian tribe's beneficial title to reservation land remains unquestioned. *See, Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 119–123, 80 S.Ct. 543, 555–557, 4 L.Ed.2d 584 (1960); *see also, Henkel v. United States*, 237 U.S. 43, 47–50, 35 S.Ct. 536, 538–539, 59 L.Ed. 831 (1915). From the time of the enactment of the Appropriations Act of March 3, 1871, the Indian tribes and the individual members thereof have been subjected to the direct legislation of Congress. *Re Heff*, 197 U.S. 488, 498, 25 S.Ct. 506, 508, 49 L.Ed. 848 (1905) (*overruled on other grounds, United States v. Nice*, 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192 (1916)). Where Congress clearly expresses its intent to extinguish an Indian tribe's beneficial title to reservation land, that legislative decision is not subject to legal contestation in the courts. *Buttz v. Northern Pacific Railroad Company*, 119 U.S. at 66, 7 S.Ct. at 104.

The legislative history attendant passage of the Act of February 15, 1887, evinces the understanding of Congress that the United States held fee title to the lands comprising the Indian reservation created by the Act of April 15, 1874, as it does to the land comprising all Indian reservations. *See, Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *Buttz v. Northern Pacific Railroad,* 119 U.S. at 66, 7 S.Ct. at 104.[4] The entire history surrounding the grant of the right-of-way further reflects that Congress was well aware of the beneficial title which the Tribes held to the lands comprising the reservation created by the 1874 Act. Specifically, in 1886 Congress established a Northwest Indian Commission to negotiate an agreement of cession with the Indians holding title to the land comprising the 1874 Act reservation. Act of May 15, 1886, c. 333, 24 Stat. 29, 44. The Commissioners appointed by the Secretary of the Interior pursuant to the Act of May 15, 1886, negotiated an agreement with the Tribes which provided that the Assiniboine and Sioux Tribes and other Tribes having an interest in the reservation created by the Act of 1874 did "cede and relinquish all their right, title and interest in and to all the lands embraced within [the 1874 reservation] ... not herein specifically set apart and reserved as separate reservations for them." The 1886 Agreement further provided in Article VIII that right-of-way through the reservation was granted by the various tribes for, *inter alia,* railroads, subject to the prescriptions delineated by the Secretary of the Interior, including compensation for the affected tribe. *See,* n. 1, *supra.* As noted, the 1886 Agreement was ultimately ratified by Congress in the Act of May 1, 1888, 25 Stat. 113. The Act expressly reiterated that the reservation established by the Act of April 15, 1874, was set apart for the "use and occupancy" of various Indian tribes, including the Assiniboine and Sioux tribes.

The entire thrust of the Tribes' argument is that tribal assent was a condition precedent to the grant of the right-of-way, since tribal assent was necessary to the extinguishment of the Tribes' beneficial title to the land comprising the right-of-way. Consistent with this premise, the Tribes expressly state that the Act of February 15, 1887, merely implemented the 1886 Agreement and must be viewed as nothing

---

4. The comments offered by Senator Teller of Colorado during the Senate debates leading to the passage of the Act of February 15, 1887, poignantly address this precise point. With specific reference to the compensation provisions incorporated into the Act, Senator Teller stated: "I have not any objection to the United States making any donations to the Indians whenever the Government of the United States sees fit. The bill shows that this is not Indian land in any sense of the term. The President of the United States reserves this land. He can tomorrow declare it to be public land again if he sees fit. He reserves it for use of the Indians. I have not any doubt about his authority to have allowed this railroad to be built across the land without any act of Congress; but they have seen fit to come to Congress and we provide that the Secretary of the Interior shall fix a price the railroad is to pay, not to the Government, whose land it is, but to the Indians, who have no title whatever in the land.... Here we provide payment to Indians who are occupying a piece of ground under an executive order. The executive order gives them no rights whatever. It simply reserves the land from occupation by white men. Now we say the Indians shall be paid for this land which they do not own. It seems to me that this provision of the bill ought to be stricken out...."

18 Cong.Rec., 1436–1437 (Feb. 7, 1887). Senator Teller was referring to those portions of the affected reservation which were created by executive order. While his conclusion that the Tribes held no title whatsoever in the land comprising the reservation established by executive order would appear to be incorrect, *see, Sioux Tribe v. United States,* 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501 (1942), his comments are indicative of the fact that Congress was aware the United States held fee title to the land comprising the subject right-of-way. The report accompanying that bill, which was introduced into the House of Representatives and ultimately passed as the Act of February 15, 1887, reflects the understanding that the Indians held beneficial title to the land comprising the reservation.

Such portions [of those reservations through which the right-of-way is granted] as are covered by statute and executive orders are merely set apart for the occupancy of the Indians. The fee remains in the Government. No right to the soil is conferred. The power that set them aside can modify them. But notwithstanding this, the Bill out of abundant caution carefully provides for all of the rights of the Indians and their proper compensation.

H.R.Rep. No. 3487, 49th Cong., 2d Sess. 1436–1437 (1887).

other than congressional consent to the Tribes' transfer of the right-of-way to the Burlington Northern's predecessor in interest. The Tribes support their position with inferences drawn from the fact that the congressional decision to establish the right-of-way through the entire Blackfeet Reservation created by the Act of April 15, 1874, occurred in temporal proximity with that legislation designed to diminish the Blackfeet Reservation created by the Act of April 15, 1874; dividing that reservation into three smaller separate reservations. The Tribes cite no authority in support of their assertion that tribal assent was necessary to the establishment of the right-of-way through reservation lands to which any Indian tribe held beneficial interest.

The Act of February 15, 1887, granted right-of-way through the Blackfeet Indian Reservation as comprised by the Act of April 15, 1874, and the Fort Berthold Reservation in the northwestern Dakota Territory. Act of February 15, 1887, 24 Stat. 402, § 1. Consistent with its plenary authority to do so, Congress could have included the right to possession within its grant. Moreover, the fact Congress, in its ratification of the 1886 Agreement establishing the diminished boundaries of the Fort Peck Indian Reservation, approved that provision of the Agreement recognizing the reserved right of the federal government to use the lands of that reservation for certain public improvements, would not, in itself, serve to derogate the validity of such a grant. The determinative inquiry is whether Congress, in its enactment of the Act of February 15, 1887, intended to extinguish the Tribes' beneficial title to the land comprising the right-of-way.

■ It is generally recognized that in the absence of an expressed intent of Congress to the contrary, railroad land grants have not affected tribal possessory rights. F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW, 518 (1982 ed.), *e.g., Northern Pacific Railroad Co. v. United States,* 227 U.S. 355, 33 S.Ct. 368, 57 L.Ed. 544 (1913); *Buttz v. Northern Pacific Railroad Co., supra; Leavenworth, L.G. & R.R. v. United States,* 92 U.S. 733, 23 L.Ed. 634 (1875). Focusing upon the legislative history at-

tendant passage of the Act of February 15, 1887, one is inexorably compelled to conclude that Congress did not express a clear intent to extinguish the beneficial title of all Indian tribes holding such an interest to the land comprising the right-of-way. Review of the statements made by individual Senators during the debate leading to passage of the bill, specifically the comments of Senator Teller, as set forth in n. 4, *supra,* evince a desire to extinguish the Tribes' beneficial title. The colloquy spawned by Senator Teller's comments, however, fail to unequivocally establish that Senator Teller's view was shared in total by his Senate colleagues. A review of that colloquy is instructive:

MR. DOLPH. I think this is a matter of more importance than seems to be considered by a majority of the Senate. In the first place, the Government has granted by general act the right of way over the public lands to every railroad company that chooses to comply with the provisions of the act of March 3, 1875. I judge from the letter of the Secretary of the Interior, and I so understand it, that the Government had already extinguished the Indian title to these lands before this reservation was set aside by executive order.

MR. TELLER. Certainly it had.

MR. DOLPH. Then the President comes in and sets aside a portion of the public domain for the use of the Indians as a reservation. If it had not been for that order, there is already existing legislation which would grant to the railroad company, by compliance with its conditions, a right of way over those lands.

Now, because of the executive order, and because the President does not choose to modify the executive order inso-far as to allow the company to locate its line over this land and to file its maps and thereby secure the right of way, the company comes to Congress for leave to deal with the Indians in regard to the reservation. As I understand, there is a provision in the bill to the effect that the company shall pay the Indians for the land—which does not belong to them, but belongs to the Government—as well as

to pay for the injury done to the improvements made by the Indians.

I think it is a wrong principle, and, as suggested by the Senator from Missouri [Mr. Cockrell], it might commit us to the idea, at least as a precedent, that the Indians had a right to the soil, or the power of the President to donate land to Indians at any time. I understand the President could rescind his order at any time, and throw any one of the reservations which have been created by executive order open to settlement without any act of Congress whatever.

MR. DAWES. There is no doubt about the President's authority to vacate the order by which he established the reservation, and there is no doubt in my mind that he could permit the railroad company to go over the land by excepting from his order so much of the land as would be occupied by the railroad. But the President and those administering Indian affairs decline to do that; and they, with the railroad company and the Indians, have agreed that for the use of this right of way, while the executive order exists, the railroad company shall pay the Indians what the Secretary of the Interior says they ought to pay for the use of the land while the executive order exists. The Senate can decline to grant this right, and the Interior Department will decline to let the railroad go through, and I shall be entirely satisfied.

MR. TELLER. Has the agreement already been made between the company and the Indians?

MR. DAWES. But, it seems to me, all at once somebody is straining at a gnat and swallowing a camel. I do not know who it is, but the idea that when the railroad company is perfectly willing to pay the Indians for the use of the land just what the Secretary of the Interior agrees, and they have all three gone into the agreement, and the money is ready, then because perchance in accordance with strict law the Secretary had the power to do it without this proposed act,

the Senate may decline to pass the bill if they choose.

*See*, 18 Cong.Rec., 1436–1437 (Feb. 7, 1887).

 The statements of individual legislators are appropriately considered with other pertinent indices of legislative intent in determining the construction to be afforded a particular statute. *See, Chrysler v. Brown*, 441 U.S. 281, 361, 99 S.Ct. 1705, 1751, 60 L.Ed.2d 208 (1979). The statements of individual legislators, however, should not be given controlling effect unless they are consistent with statutory language and other legislative history which justifies reliance upon them as evidence of Congress' intent. *Grove City College v. Bell*, 465 U.S. 555, 567, 104 S.Ct. 1211, 1218, 79 L.Ed.2d 516 (1984).

In searching for the intent of Congress in the passage of the Act of May 1, 1888, the court is not limited, however, to the "lifeless words of the statute," but recognizing that the Act in question was the product of the period, the court may "with propriety refer to the history of the times when the Act was passed." *Great Northern Railway Company v. United States*, 315 U.S. 262, 273, 62 S.Ct. 529, 533, 86 L.Ed. 836 (1942) (citations omitted). In the *Great Northern* case, the Court was called upon to ascertain the nature of the rights conferred upon the Burlington Northern's predecessor in interest with respect to a right-of-way granted under authority of the Act of March 3, 1875.[5] In resolving the question presented, the Supreme Court relied extensively upon a sharp shifting congressional policy occurring in 1871 with respect to the granting of railroad rights-of-way. *See, Great Northern Railway Company v. United States*, 315 U.S. 262, 273–276, 62 S.Ct. 529, 533–535, 86 L.Ed.2d 836 (1941). Recognizing that legislation establishing railroad right-of-way granted, in general, a more limited interest, the Court in *Great Northern* concluded that it was improbable that Congress intended by the Act of March 3, 1875, to grant more than a

---

**5.** The right-of-way of concern in the *Great Northern* case is one associated with the same rail line which utilizes the right-of-way at issue in the case at bar. The right-of-way at issue in the *Great Northern* case crossed public lands contiguous to the Blackfeet Indian Reservation as defined by the Act of May 1, 1888.

right of passage. 315 U.S. at 274–275, 62 S.Ct. at 534–535.

█ Having assiduously reviewed the text of, and legislative history attendant, the Act of February 15, 1887, the court is compelled to conclude that the expression of Congress' intent contained therein with respect to the extinguishment of the Tribes' beneficial title to the land comprising the right-of-way is, at best, ambiguous. Consistent with compelling precedent, this doubtful expression must be resolved in favor of the Tribes. *See, Menominee Tribe v. United States*, 391 U.S. at 413, 88 S.Ct. at 1711; *United States ex rel. Hualpai Indians v. Santa Fe Pacific Railroad*, 314 U.S. at 354, 62 S.Ct. at 255.

Accordingly, the court finds the Tribes retain beneficial title to the land comprising the Railroad right-of-way across the Fort Peck Indian Reservation. Hence, the territorial component essential to the valid exercise of the Tribes' taxing authority is satisfied with respect to the disputed tax.

### V.

█ Cognizant of the plenary authority of Congress to limit tribal sovereignty, and particularly a tribe's authority to tax non-members, *see, Merrion v. Jicarilla Apache Tribe*, 455 U.S. at 141, 102 S.Ct. at 903, the court now addresses the Railroad's argument that Congress has implicitly abrogated the Tribes' authority to impose the utility tax. The Railroad generally asserts that the comprehensive regulatory scheme implemented by Congress to govern the operation of railroads in interstate commerce, evince a congressional intent to preempt taxation of railroads by Indian tribes. Tribal taxation of the Railroad's right-of-way interest, the Railroad submits, would be inconsistent with the superior interest of the United States in having a uniform system of railroad regulation. The Railroad places specific reliance upon section 306 of

the Railroad Revitalization and Regulatory Reform Act, Pub.L. 94–210, 90 Stat. 31 (49 U.S.C. § 11503), which the Railroad contends, implicitly divests the Tribes of their inherent sovereign authority to impose a tax upon the Railroad.

The arguments advanced by the Railroad are identical to those advanced by the petitioner in *Merrion* challenging the severance tax at issue in that case. Accordingly, the mode of analysis utilized by the Supreme Court in *Merrion* is appropriately followed by this court in reviewing the Railroad's argument that Congress divested the Tribes of their authority to impose the utility tax at issue. The court appropriately undertakes its review cognizant of the admonition espoused in *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 60, 98 S.Ct. 1670, 1678, 56 L.Ed.2d 106 (1978):

> The proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent. The purpose of the Railroad Revitalization and Regulatory Reform Act was 'to provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system of the United States.'

Section 101(a).

Among the means chosen by Congress to fulfill these objectives, particularly the goal of furthering railroad financial stability, was a prohibition on discriminatory *state* taxation of railroad property. *Burlington Northern Railroad Company v. Oklahoma Tax Commission*, 481 U.S. 454, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987). Congress' solution to the problem of discriminatory state taxation of railroads was embodied in section 306 of the Act, currently codified at 49 U.S.C. § 11503. *Id.*[6] The

---

6. Title 49 U.S.C. § 11503(b) provides in relevant part:

The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them: (1) assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property. (2) levy or collect a tax on an assessment that may not be made under clause (1) of this subsection. . . .

Act does not refer to Indian tribes and the language of the Act can hardly be construed as providing a clear indication that Congress intended to deprive the various Indian tribes of their sovereign power to tax. Accordingly, the court is constrained to find that the Federal Government has not divested the Tribes of their inherent authority to tax the Railroad's right-of-way. *See, Merrion v. Jicarilla Apache Tribe,* 455 U.S. at 152, 102 S.Ct. at 909.

Contrary to the assertion of the Railroad, the situation presented is akin to that addressed by the Supreme Court in *Merrion.* Like the petitioner in *Merrion* the Railroad is unable to explain why state taxation of the same type of activity, of which the Railroad complains, escapes the asserted conflict with federal policy. 455 U.S. at 151, 102 S.Ct. at 908, *citing, Commonwealth Edison Company v. Montana,* 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981). Moreover, the court is persuaded by the Tribes' argument that the tax fosters rather than inhibits, an important national policy, *i.e.,* promotion of Indian self-determination and economic development, *see, California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987); *New Mexico v. Mescalaro Apache Tribe,* 462 U.S. 324, 335, 103 S.Ct. 2378, 2387, 76 L.Ed.2d 611 (1983); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143 and n. 10, 100 S.Ct. 2578, 2584 and n. 10, 65 L.Ed.2d 665 (1980); by providing a means of enabling tribal government necessary to the provision of essential government services. *See, Merrion v. Jicarilla Apache Tribe,* 455 U.S. at 137, 102 S.Ct. at 901.

## VI.

Finally, the court reviews the Railroad's argument that the utility tax, as applied to the Railroad, violates the "negative implications" of the commerce clause of the United States Constitution.[7]

■ It is a well-established principle that a state violates the "negative implica-

tions" of the interstate commerce clause by unilaterally enacting legislation which unduly burdens or discriminates against interstate commerce. Review by federal courts is obviously appropriate where such unilateral state action is challenged, since such review insures that states do not disrupt or burden interstate commerce when the power vested in Congress by the interstate commerce clause remains unexercised. *See, Merrion v. Jicarilla Apache Tribe,* 455 U.S. at 154, 102 S.Ct. at 910. Review in those instances is essential to safeguard Congress' latent power from encroachment by the several states. Federal courts may legitimately engage in this review, however, only when Congress has not acted or purported to act. *Id., citing, Prudential Insurance Company v. Benjamin,* 328 U.S. 408, 421–427, 66 S.Ct. 1142, 1150–1154, 90 L.Ed. 1342 (1946). As stated by the Court in *Merrion:*

> Once Congress acts, courts are not free to review state taxes or other regulations under the dormant Commerce Clause. When Congress has struck the balance it deems appropriate, the courts are no longer needed to prevent States from burdening commerce, and it matters not that the courts would invalidate the state tax or regulation under the Commerce Clause in the absence of congressional action. See *Prudential Insurance Company v. Benjamin, supra,* [328 U.S.] at 431 [66 S.Ct. at 1155]. Courts are final arbiters under the Commerce Clause only when Congress has not acted. *See, Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. [434] at 454 [99 S.Ct. 1813, 1824, 60 L.Ed. 336].

455 U.S. at 154–155, 102 S.Ct. at 910–911.

■ Where Congress acts pursuant to the authority vested in that body by the interstate commerce clause to approve a tax by an Indian tribe, it is not the function nor the prerogative of the federal courts to question the wisdom of that decision. *See, Merrion v. Jicarilla Apache Tribe,* 455

---

**7.** Cognizant of the conceptual difficulty acknowledged by the Supreme Court with respect to the review of tribal action under the interstate commerce clause, and the Court's refusal to review tribal regulation of commerce under

the Indian commerce clause, this court, as did the Court in *Merrion,* assumes that tribal action is subject to the limitations of the interstate commerce clause. 455 U.S. at 153–54, 102 S.Ct. at 910–11.

U.S. at 156, 102 S.Ct. at 911. As the Court in *Merrion* recognized, where Congress has affirmatively acted by providing a series of federal checkpoints that must be cleared before a tribal tax can take effect and a challenged tax has traveled through those precise channels, judicial review of the validity of the tax under the "negative implications" of the interstate commerce clause is precluded. 455 U.S. at 155–156, 102 S.Ct. at 910–911.

■ The same checkpoints recognized by the Court in *Merrion* are present in the case at bar. Consistent with the requirements of the Indian Reorganization Act, 25 U.S.C. §§ 476, 477, the Tribes obtained approval from the Secretary before they adopted the constitution announcing their intention to tax nonmembers. Further, before the ordinance imposing the tax challenged by the Railroad could take effect, the Tribes were required again to obtain approval from the Secretary. *See,* CONSTITUTION AND BYLAWS OF THE ASSINIBOINE AND SIOUX TRIBES OF THE FORT PECK INDIAN RESERVATION, Article VIII, section 3. Both the Tribes' constitution and the challenged tax ordinance received the requisite approval from the Secretary of the Interior. Consequently, this court is without authority to strike down the tax as violative of the "negative implications" of the interstate commerce clause.

## B. THE BLACKFEET TRIBE

The Burlington Northern Railroad challenges the authority of the Blackfeet Tribe of Indians to tax the right-of-way occupied by that entity on land crossing the Blackfeet Indian Reservation. The Railroad seeks a declaration that the Blackfeet Tribe of Indians is without authority to impose a tax upon the right-of-way held by the Railroad across lands within the boundaries of the Blackfeet Indian Reservation. On July 20, 1987, the court entered an order preliminarily enjoining the Blackfeet Tribe from levying the disputed tax upon the Railroad's right-of-way. The matter is presently before the court on cross-motions for summary judgment for a final determination of whether the Blackfeet Tribe should be permanently enjoined from attempting to levy the disputed tax.

## I.

The Blackfeet Tribe of Indians is a tribe organized under a constitution and by-laws promulgated under authority of the Indian Reorganization Act of 1934 (25 U.S.C. §§ 476 *et seq.*). The Blackfeet Tribal Council, as governing body of the Blackfeet Tribe, is empowered by the Blackfeet Constitution to levy taxes upon nonmembers of the Tribe "trading or residing" within the Blackfeet Reservation. *See,* BLACKFEET CONSTITUTION, art. VI(1)(h). On December 30, 1986, the Blackfeet Tribal Council enacted a possessory interest tax ordinance which authorized taxation of any interest in real property located within the Blackfeet Reservation. The ordinance was approved by an authorized representative of the Secretary of Interior on April 9, 1987. The Blackfeet Tribe has deemed the ordinance applicable to the Railroad's right-of-way across the Blackfeet Reservation, and has taken steps to levy the tax upon the right-of-way. The Tribe views the imposition of the tax as a legitimate exercise of its sovereign authority.

The Railroad asserts that because the right-of-way it holds over the Blackfeet Reservation was established pursuant to an act of Congress, the Blackfeet Tribe has been divested of its sovereign authority to impose a tax with respect to that right-of-way. In the alternative, the Railroad seeks a declaration that the ordinance is null and void, as violative of the commerce clause of the United States Constitution and section 306 of the Railroad Revitalization and Regulatory Reform Act, Pub.L. 94–210, 90 Stat. 31 (49 U.S.C. § 11503).

The court need not restate the general principles of law determinative of an Indian tribe's right to impose a tax upon a nonmember, or the principles of statutory construction applicable to legislation affecting the rights of Indian tribes. The pertinent principles previously discussed by the court, in the companion case of *B.N. v. Assiniboine and Sioux Tribes of the F.P. Indian Reservation,* CV–87–055–GF (D.Mont.1988), obviously guide analysis of

the issue presented here for determination. Therefore, the court turns to determine whether Congress acted to extinguish the Blackfeet Tribe's beneficial interest in the land comprising the right-of-way.

## II.

The Blackfeet Reservation, as presently existing, was originally reserved to the Blackfeet Tribe by the Treaty of October 17, 1855, 11 Stat. 657. The original reservation was subsequently reduced in size and modified by various executive orders, congressional acts and agreements. *See, e.g.,* Exec. Order of July 5, 1873; Act of April 15, 1874, 18 Stat. 28. Of these orders and acts, the one of principal importance to the present controversy is the Act of April 15, 1874, by which Congress set apart a vast area of land for the "use and occupation" of numerous Indian tribes including the Blackfeet Tribe. By the Act of May 1, 1888, 25 Stat. 113, Congress established the present diminished boundaries of three separate reservations for the various northern Montana Indian tribes, one of which was the Blackfeet Reservation. The Blackfeet Reservation continued within its aboriginal territory and within the original reservation boundaries established in 1855 and 1874. The Act of May 1, 1888, represented the congressional ratification of agreements of land cession, executed between the United States and the various northern Montana tribes, including the Blackfeet Tribe.

Article VIII of the Act of May 1, 1888, provided that right-of-way through the reservations was granted by the various tribes for, *inter alia,* railroads; subject to the prescriptions delineated by the Secretary of the Interior, including compensation for the affected tribe.[8] On September 29, 1890, the Burlington Northern's predecessor in interest, *i.e.,* St. Paul, Minneapolis & Manitoba Railway Company, having begun construction of its railroad through eastern Montana, applied to the Commissioner of Indian Affairs for authority to extend its line of railway through the Blackfeet Indian Reservation. On October 20, 1890, President Benjamin Harrison, pursuant to Article VIII of the Act of May 1, 1888, granted the railroad's application for right-of-way. On October 24, 1890, the Secretary of the Interior prescribed the dimensions of the right-of-way to be the same as the dimensions prescribed for the right-of-way granted by the Act of February 15, 1887, 24 Stat. 402, across portions of the Blackfeet Reservation as established by the Act of April 15, 1874.

The Railroad seeks a declaration that Congress extinguished the Blackfeet Tribe's beneficial interest to that reservation land comprising the right-of-way granted the Burlington Northern's predecessor in interest. The Blackfeet Tribe takes the position that the grant of the right-of-way was, in effect, negotiated and granted by the Blackfeet Tribe. Accordingly, the Blackfeet Tribe asserts that the right-of-way granted to the Burlington Northern Railroad Company's predecessor in interest was simply an easement granted by the Tribe and approved by Congress.

■ Analysis must begin with recognition of the fact that the Blackfeet Tribe held full beneficial fee interest in the land comprising the right-of-way. *See,* F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW, 477–485 (1982 ed.), and cases cited therein.[9] Consequently, the question

---

**8.** *See,* n. 1, *supra.*

**9.** For purposes of the present analysis, the court considers the Blackfeet Tribe's property rights in the reservation as established by specific Acts of Congress and, therefore, subject to the just compensation requirement of the fifth amendment to the United States Constitution. *See, Shoshone Tribe v. United States,* 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937); *Choate v. Trapp,* 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912); *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). Without specific discussion, the Blackfeet Tribe

alludes to the fact that the Blackfeet Reservation, as presently existing, is part of the aboriginal territory of the Blackfeet Tribe. Regardless of whether the title held by the Blackfeet Tribe to the land comprising the right-of-way in question is considered "recognized" title held pursuant to congressional action, or "unrecognized" title based upon aboriginal title, *see,* F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW, 486–493 (1982 ed.), the Blackfeet Tribe had the right to occupy that land. *See, Johnson v. M'Intosh,* 21 U.S. (8 Wheat.) 543, 574, 5 L.Ed. 681 (1823). As with recognized Indian title, the underlying fee simple title of lands to which an Indian tribe

presented is whether Congress acted to extinguish the Blackfeet Tribe's title to the land comprising the right-of-way granted the Burlington Northern's predecessor in interest through the Blackfeet Reservation.

Whether or not the Blackfeet Tribe's beneficial title to the land comprising the right-of-way was extinguished depends upon the construction to be given the act of Congress granting that right-of-way. *United States v. Soldana*, 246 U.S. 530, 531, 38 S.Ct. 357, 358, 62 L.Ed. 870 (1918). If the Blackfeet Tribe's beneficial title to that land was extinguished by the grant, the right-of-way is not within Indian country. *Id.* at 531, 38 S.Ct. at 358, *citing, Bates v. Clark*, 95 U.S. 204, 24 L.Ed. 471 (1877). The parties concede that the only statute which need be considered in determining whether the Blackfeet Tribe's beneficial interest to the land comprising the right-of-way was extinguished is the Act of May 1, 1888, 25 Stat. 113, which confirmed the establishment of the diminished boundaries of the Blackfeet Indian Reservation.

In construing the Act of May 1, 1888, from which the Railroad derives the interest it holds in the right of way across the Blackfeet Reservation, the court is not unmindful of the fact that in the absence of an expressed intent of Congress to the contrary, railroad land grants have been construed as not having affected tribal possessory rights. F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW, 518 (1982 ed.), and cases cited as examples. Moreover, the court recognizes that the Act of May 1, 1888, was intended fully to protect Indian interests. Accordingly, it must be liberally construed in favor of the Indians, *see, Bryan v. Ataska County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976); *accord, Southern Pacific Transportation Company v. Watt*, 700 F.2d 550, 552 (9th Cir.1983), with any doubtful expressions of congressional intent being resolved in favor of the Black-

feet Tribe. *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973) (quoting, *Carpenter v. Shaw*, 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930)).

This court is further guided by the Supreme Court's decision in *United States v. Soldana, supra*, wherein the United States Supreme Court was called upon to determine whether a railroad right-of-way granted through the Crow Indian Reservation, pursuant to Article VIII of the same Act of May 1, 1888, was properly considered Indian country for purposes of the enforcement of criminal statutes. The Court stated:

> Whether these Acts should be held to have granted a mere easement or a limited fee or some other limited interest in the land, (citations omitted); it is clear that it was not the purpose of Congress to extinguish the title of the Indians in the land comprised within the right-of-way. To have accepted the strip from the reservation would have divided it into two; and would have rendered it much more difficult, if not impossible, to afford that protection to the Indians which the provisions quoted were designed to insure.

246 U.S. at 532–33, 38 S.Ct. at 358–359.

In reaching its determination, the Court in *Soldana* also considered the Act of February 12, 1889, 25 Stat. 660, which specifically granted the right-of-way through the Crow Indian Reservation. That Act provided, at section 5, that the grant of the right-of-way was upon the express condition that the grantees and successors "will neither aid, advise, nor assist in any effort looking towards the changing or extinguishing the present tenure of the Indians in their land, and will not attempt to secure from the Indian tribes any further grant of land or its occupancy that is hereinbefore provided: *provided,* that any violation of

---

holds unrecognized title can be conveyed subject to the Indian right of occupancy. *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810). Likewise, the exclusive right to extinguish original Indian title rests with Congress, *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); *United States ex rel Hualpai Indians v. Santa Fe*

*Pacific Railroad Company,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941), and such title will be deemed to have been extinguished only where there exists a clear and specific indication of congressional intent to abrogate that title. *See, United States ex rel Hualpai Indians v. Santa Fe Pacific Railroad Company,* 314 U.S. 339, 354, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941).

the condition mentioned in this section shall operate as a forfeiture of all rights and privileges of said railroad company under this Act." 246 U.S. at 532, 38 S.Ct. at 358.[10]

 Construing Article VIII of the Act of May 1, 1888, in accordance with the dictates of the foregoing principles of construction, and cognizant of the construction afforded this same provision by the United States Supreme Court in the factual context presented in *Soldana,* the court is compelled to conclude that it was not the purpose of Congress to extinguish the Blackfeet Tribe of Indians' beneficial title to the land comprising the right-of-way.

The Burlington Northern fails to present a cogent argument which persuades the court that the right-of-way granted its predecessor in interest across the Blackfeet Reservation should be viewed differently than the right-of-way for the same railroad line granted by Congress across public land. Absent a clearly expressed congressional intent to extinguish the Blackfeet Tribe's beneficial title to the land comprising the right-of-way, this court would be remiss to impute that intent to Congress. *See, Menominee Tribe v. United States,* 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968). Consequently, the court is constrained to conclude that the Blackfeet Tribe retains beneficial title to the land comprising the subject right-of-way across the Blackfeet Reservation, and

therefore the territorial component essential to the valid exercise of the Blackfeet Tribe's taxing authority is satisfied.

The court finds it unnecessary to specifically address the remaining challenges advanced by the Railroad. The rationale expressed by the court in *Burlington Northern v. Assiniboine-Sioux Tribes of the Fort Peck Indian Reservation,* CV-87-055-GF (D.Mont.1988), adequately disposes of these alternative arguments.[11]

An appropriate order shall issue.

---

10. Without elaborating, the Court in *Soldana* stated that the case of *Clairmont v. United States,* 225 U.S. 551, 32 S.Ct. 787, 56 L.Ed. 1201 (1912), was factually distinct since *Clairmont* "involved a statute which extinguished the Indian title." 246 U.S. at 530, 38 S.Ct. at 357. The issue presented for resolution in the *Clairmont* case was whether the land comprising a railroad right-of-way held by the Northern Pacific Railroad Company across the Flathead Indian Reservation, Montana, was property considered "Indian country" for the purpose of applying certain federal criminal statutes. The preliminary question resolved was whether Congress acted to extinguish the Indian title to the land comprising the right-of-way. 225 U.S. at 556, 32 S.Ct. at 788. The Court held that by the Act of July 2, 1864, 13 Stat. 365, Congress granted the railroad company fee title to the land constituting the right-of-way. 225 U.S. at 555–56, 32 S.Ct. at 787–88; *citing, Buttz v. Northern Pacific Railroad Company,* 119 U.S. 55, 56, 66, 7 S.Ct. 100, 101, 104, 30 L.Ed. 330 (1887); *Northern*

*Pacific Railway Company v. Townsend,* 190 U.S. 267, 271, 23 S.Ct. 671, 672, 47 L.Ed. 1044 (1903). The Court further held that upon execution of an agreement between the confederated tribes of the Flathead Indian Reservation, and subsequent approval by Congress of that agreement, *see,* Ex. Doc. No. 15, 48th Cong., 1st Sess. (1892), the Indians had surrendered and relinquished all right, title and interest to the land comprising the right-of-way. 225 U.S. at 556, 32 S.Ct. at 788.

11. The Blackfeet Tribe obtained approval from the Secretary of the Interior before it adopted its constitution announcing its intention to tax nonmembers. Further, before the ordinance imposing the tax challenged by the Railroad could take effect, the Tribe was required again to obtain approval from the Secretary. *See,* BLACKFEET CONSTITUTION, art. VI(1)(h). Both the Tribe's constitution and the challenged tax ordinance received the requisite approval from the Secretary of the Interior.